[No. A117633. First Dist., Div. One. Dec. 13, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
SUSAN MAE POLK, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., B., D.–I.

1184

**Counsel**

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Catherine McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MARGULIES, Acting P. J.**—Defendant was convicted of the second degree murder of her husband following a trial at which she acted as her own attorney. The husband's body had been found in a cottage at their home, stabbed repeatedly. Defendant admitted the stabbing but testified she acted in self-defense.

Defendant argues the trial court should have dismissed the jury panel after the prosecution was unable to explain its peremptory challenge of a female juror, erred in failing to give an instruction on heat of passion voluntary manslaughter, and should not have admitted her statements to police, which were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*). In addition, defendant contends the court, prosecutor, and jury committed prejudicial misconduct in the course of the trial. Finding no prejudicial error, we affirm the conviction.

During the proceedings, defendant executed a promissory note, secured by a lien against the family home, agreeing to reimburse the County of Contra Costa (County) for costs incurred in her defense. Following the trial, the County sought an order compelling defendant to reimburse those costs from the proceeds of the sale of her interest in the home. Although the trial court held a hearing with respect to the amount of reimbursable costs incurred by the County, it refused to consider whether defendant had the "present ability" to pay those costs, as required by Penal Code section 987.8, subdivision (b), concluding the presence of the lien made such a finding unnecessary. We conclude the County's lien did not obviate the need for the trial court to determine whether defendant had the financial ability to reimburse the County's expenses, and we remand for the necessary hearing.

## I. BACKGROUND

Defendant was charged in a single-count indictment, filed August 27, 2003, with the murder of her husband. (Pen. Code, § 187.) The indictment further alleged defendant personally used a deadly and dangerous weapon. (Pen. Code, § 12022, subd. (b)(1).) During defendant's initial trial, she was represented by counsel, but the court declared a mistrial when her attorney suffered a family tragedy. Following a second trial in which defendant represented herself, a jury convicted her of second degree murder, with a finding she used a deadly and dangerous weapon. The trial court imposed a sentence of 16 years to life.

Defendant and her husband, Felix Polk, had been married for 21 years at the time of the killing and had three teenaged sons.[1] At 71, Felix was 26 years older than defendant. They first met nine years before their marriage when Felix, a psychologist, began treating defendant, then a high school student.

In October 2002, when the killing occurred, the couple was enmeshed in divorce proceedings. When Felix first retained divorce counsel in 2001, he told his attorney defendant "could be violent" and was "unpredictable and . . . possibly dangerous." As the proceedings progressed, Felix became more concerned about defendant. By August 2002, Felix was "in fear for his life." According to the couple's youngest son, Gabriel, defendant said on several occasions she intended to kill Felix and discussed the manner in which she would do so. As a result of the frequency and intensity of these threats, a week before the murder Gabriel told his father he "was scared for his [father's] life."

On October 2, 2002, while defendant was away in Montana, Felix obtained a court order granting him custody of Gabriel and exclusive use of the family home in Orinda. When defendant learned of the court order soon after, she and Felix had a "heated" telephone call, during which she threatened to kill him. Felix took the threat seriously enough to report it to the police.

Defendant returned to Orinda on October 9. While Felix was at work the next day, she persuaded Gabriel to help her move Felix's bed and other possessions into a cottage on the property. After Felix arrived home, they had another angry argument, during which defendant again threatened to kill Felix. The police were called, and Felix and Gabriel moved briefly into a hotel. Three days later, a Sunday, Felix and Gabriel awoke early to drive the family's oldest son, Adam, to school at UCLA (University of California at Los Angeles), returning to the Orinda home late at night. Gabriel went to sleep in the house, while Felix retired to the cottage.

The next day, Felix did not return home from work at the expected time and could not be located by telephone. When Gabriel asked defendant if she knew where Felix was, she said she did not know. Gabriel eventually became suspicious and, later in the evening, checked the cottage, finding the front door locked. When Gabriel returned to the house and again asked defendant about Felix, she said, "Aren't you happy he's gone? I am," and, later, "I

---

[1] Because defendant's contentions on appeal do not challenge the sufficiency of the evidence, in this background we review only in general terms the principal evidence from a lengthy trial. To the extent necessary, the particular procedural circumstances and evidence relevant to each of defendant's appellate arguments are set out in subsequent portions of the opinion.

guess I didn't use a shotgun, did I?" Unnerved by these enigmatic comments, an hour later Gabriel returned to the cottage, found a second door unlocked, and entered. Inside, he glimpsed his father lying motionless on his back, covered in blood. Gabriel returned to the house, grabbed a telephone, and hiding from his mother outside, called the police.

When police arrived, they found the floor of the cottage living room covered in dried blood. Tracked across the floor were bloody shoe prints matching defendant's shoe size, along with her bloody footprint. Felix's body, hands still clutching a clump of defendant's hair, was found, according to the prosecution's pathologist, to have at least five deep stab wounds, individually penetrating his right lung, stomach, pericardium, diaphragm, and the fat near his kidneys. He also had a large number of superficial stab wounds and defensive cuts to his hands, forearms, feet, and lower legs and a blunt force injury behind his right ear.

When told of Felix's death by police, defendant showed no emotion, saying, "Oh well, we were going to get a divorce anyhow." In a subsequent police interview, she professed ignorance of Felix's death, evenly recounting her marital grievances with Felix and claiming to have last seen him early on the prior morning, before he and Gabriel drove Adam to Los Angeles. Police examined defendant for fresh wounds and found none.

At trial, defendant acknowledged killing Felix, characterizing her acts as self-defense. Defendant described at length her troubled marriage, characterized by Felix's psychological and physical abuse of her. On the night of the killing, she testified, she went to the cottage to talk to Felix between 10:30 and 10:45, taking pepper spray as a precaution. For a time, they discussed financial matters and their children. Felix became angry, and at some point he walked over and struck defendant in the face. Defendant sprayed him, but he was undeterred, hitting her again. After further struggle, he grabbed a knife and stabbed at her leg, piercing her pants. Afraid for her life, defendant kicked Felix in the groin, grabbed the knife from him, and began stabbing him. She then took steps to cover up the killing and denied involvement to the police because she believed she would be "railroaded" by the criminal justice system.

The couple's middle son, Eli, testified in support of defendant. Eli, who was residing at a boys ranch at the time of the killing, confirmed Felix was violent and controlling. Contrary to the testimony of his brothers, Eli denied defendant was ever violent with Felix or had ever threatened him.

Defendant also offered Dr. John Cooper, an expert on forensic pathology, to opine on the cause of Felix's death. According to Cooper, Felix died of

"acute coronary insufficiency due to severe coronary artery disease," to which the multiple stab wounds "were a contributing factor." Cooper reasoned Felix's wounds, although serious, were not immediately life threatening. Felix had, however, serious coronary disease, including severe blockage of two main arteries, which was the primary cause of his death. As a result, Cooper believed Felix's death to have been "natural," rather than the result of a homicide. Cooper also explained the pattern of Felix's wounds was consistent with defendant's claim of self-defense. In addition to Cooper, several other witnesses, including experts, testified for defendant.

## II. DISCUSSION

Defendant raises a number of challenges to her conviction. We consider each in turn.

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. Miranda *Violation*

Defendant contends the trial court erred in admitting evidence of statements she made to police during an interrogation following the discovery of Felix's killing because she was not given proper warnings under *Miranda, supra*, 384 U.S. 436. The Attorney General effectively concedes the warnings did not comply fully with *Miranda's* requirements, a failing that would have justified exclusion of the statements in the prosecution's case-in-chief. The Attorney General argues, however, that defendant forfeited any claim of error by failing to raise this issue at trial and that any error from admission of the statements was harmless.

#### 1. *Background*

Defendant was interviewed by police soon after Felix's body was discovered. The interviewing officer began by telling defendant she was not free to leave and, as a result, was entitled to be informed of her legal rights. He then told her she had "the right to remain silent," to have an attorney present during questioning, and to an appointed attorney if she could not afford one. When the officer then asked defendant if she wanted to discuss "what happened," she said she did, although she complained she was "very, very tired." Noting he was tired as well, the officer began to question her. Defendant's subsequent statements were introduced as evidence during the prosecution's case.

---

*See footnote, *ante*, page 1183.

There is no question the officer's warning did not comply with *Miranda*, which requires a criminal suspect to be informed not only that he or she has the right not to answer questions—to remain silent—but also that if he or she elects to waive that right, any resulting statements can be used against the suspect in court. (*Miranda, supra,* 384 U.S. at p. 469.) If an interviewing officer fails to give either of these warnings or the other two warnings mentioned by the officer relating to counsel, *Miranda* precludes introduction of the statements in the prosecution's case-in-chief. (See *People v. Bradford* (2008) 169 Cal.App.4th 843, 854 [86 Cal.Rptr.3d 866] (*Bradford*).) Because the officer did not warn defendant her statements could be used against her in court, admission of the statements during the prosecution case was objectionable.

Despite the unambiguous nature of the officer's error, defendant never raised this issue below. Prior to the first trial, defendant's retained counsel did move to suppress her statements to police, but he did not challenge the adequacy of the *Miranda* warnings given to defendant, despite making the motion to suppress under the purported authority of *Miranda*. Instead, counsel argued the statements were "coerced" because police pressured defendant by taking Gabriel into custody at the same time she was detained. Counsel also challenged the admissibility of statements defendant made to police prior to being given any *Miranda* warnings.

An evidentiary hearing was held prior to the first trial at which defendant and the officer testified. The trial court ruled defendant was taken into custody at her home, prior to the formal police interrogation, but it refused to suppress her comments made at that time because they were not made in response to police questioning. The court also rejected her claim of coercion regarding statements made after the *Miranda* warnings were given. Although counsel had not challenged the adequacy of the *Miranda* warnings given defendant, the court nonetheless noted that it had reviewed the tape of the interview and concluded "a *Miranda*, full *Miranda*, advisement was given." Defense counsel did not object to or otherwise comment on the court's unsolicited conclusion that a full *Miranda* warning had been given, although he was provided an opportunity to do so.

During preparation for the second trial, defendant was initially represented by retained counsel. When the attorneys were discussing with the court the need for making in limine motions in preparation for the second trial, the court ruled that all pleadings, arguments, and rulings of the court from the first trial would be incorporated into the second trial, "with the understanding that you're not waiving any objections or . . . objections to rulings, that you made the first time."

Defendant soon thereafter made a motion under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], for leave to represent herself. At the same time, her attorney declared an actual conflict had developed with defendant and asked to be relieved of his representation. The request was granted, and defendant was permitted to proceed in propria persona. There is no indication in the record counsel had any continuing role in defendant's case.

At the second trial, after the testimony of the officers who responded to her home, defendant raised a general objection "to every non-*Mirandized* statement," disputing again the admissibility of the statements she made before being interrogated at the police station. In response, the court noted, "The *Miranda* issue was litigated prior to the first trial. It wasn't renewed formally. I'm gathering that there's a renewal of that." The court denied the motion after further argument.

Later, when one of the interrogating officers testified, defendant objected to admission of the statements she made to him as "a violation of my *Miranda* rights." The court initially responded, "The *Miranda* issue is one for the Court, and has already been litigated and decided." When defendant contended, "I have new evidence," however, the court sent the jury away and heard argument. Defendant told the court, "I have examined the . . . transcripts very carefully, and I have done some more research. And . . . the transcripts indicate that prior to talking to [the interrogating officer] I told him that I was very, very tired. That is enough to trigger . . . not just a *Miranda* warning, but to indicate to the officers that they should not proceed with the discussion." In the colloquy that followed, defendant did not challenge the substantive adequacy of the *Miranda* warnings, although she did raise again the issues surrounding the statements she made before being given the warnings. The court overruled defendant's objection, in the process reiterating that it had earlier concluded the *Miranda* warnings were "properly given."

Based on this record, there is no question the issue now raised—the substantive adequacy of the *Miranda* warnings given to defendant prior to her police interrogation—was never brought to the attention of the trial court or asserted as a basis for suppressing her statements during trial. Defendant cited *Miranda*, but the only arguments made under the authority of that decision were the claims her statements given after the *Miranda* warnings were coerced and her statements made prior to the warnings should be suppressed.

### 2. *Waiver*

█ " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted,

where an objection could have been, but was not, presented to the lower court by some appropriate method . . . . The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver . . . . Often, however, the explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." ' [Citation.] ' "The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." ' [Citation.] ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

■ Under Evidence Code section 353, subdivision (a), a judgment can be reversed because of an erroneous admission of evidence only if the record contains an objection both " 'timely made and so stated as to make clear the specific ground of the objection' " or motion. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 20 [45 Cal.Rptr.3d 407, 137 P.3d 229].) If a defendant fails to make a timely objection on the precise ground asserted on appeal, the error is not cognizable on appeal. (*Ibid.*) Accordingly, unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision. (*People v. Rundle* (2008) 43 Cal.4th 76, 120–121 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]; *People v. Holt* (1997) 15 Cal.4th 619, 666 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Because she did not raise the issue of the substantive adequacy of the *Miranda* warnings in the trial court, defendant has forfeited that issue on appeal.

Defendant argues she "properly preserved" the issue by objecting on grounds of *Miranda* both prior to the first trial and during the second trial. As the discussion of the record shows, however, defendant did not merely cite *Miranda*. She and her retained counsel carefully articulated their arguments under *Miranda*. Both arguments contended her statements to police were coerced. No mention was made of the warnings themselves. These claims of coercion are simply not sufficient to preserve the present issue under Evidence Code section 353, subdivision (a), because they did not call to the attention of the trial court the substantive inadequacy of the warnings under *Miranda* and provide the trial court an opportunity to avoid error on

that ground. On the contrary, as noted above, when the trial court sua sponte expressed an opinion the warnings were adequate, retained counsel acceded to the characterization.[9]

### 3. *Ineffective Assistance of Counsel*

█ Defendant contends that, if she has forfeited her right to raise the inadequacy of the *Miranda* warnings because the issue was not presented to the trial court, the failure to raise the issue was a consequence of ineffective assistance of counsel. Defendant, however, represented herself in the trial resulting in the judgment presently on appeal. "Defendants who have elected self-representation may not thereafter seek reversal of their convictions on the ground that their own efforts were inadequate and amounted to a denial of effective assistance of counsel." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1226 [259 Cal.Rptr. 669, 774 P.2d 698].)

Defendant contends the fault for the failure to raise the inadequacy of the *Miranda* warnings lay with her retained counsel, whose motion in limine to suppress the statements prior to the first trial did not mention it. When a defendant elects self-representation, however, he or she can cite the errors of counsel as constituting ineffective assistance only when counsel has been assigned a particular role in connection with the proceedings, and only to the extent counsel has performed inadequately in that role. (*People v. Blair* (2005) 36 Cal.4th 686, 723 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; see, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150] [allowing ineffective assistance claim where defendant officially represented himself, but his attorneys retained responsibility for pretrial and trial proceedings].) While it is true, as defendant argues, her counsel was not merely advisory but responsible for all aspects of her defense at the first trial, he was relieved of those duties prior to commencement of the second trial, which led to the judgment here under consideration. As far as the record reveals, he had no role in that trial. Rather, defendant took on herself the responsibility for making all evidentiary objections. It was therefore defendant's own failure to raise the *Miranda* issue when her statements to police were offered into evidence in the second trial that led to the forfeiture. "A self-represented defendant may not claim ineffective assistance on account of counsel's

---

[9] We find no significance in the trial court's sua sponte evaluation of the adequacy of the *Miranda* warnings. As noted below, the trial court showed a willingness to listen to argument about its earlier rulings throughout the second trial. We have no reason to conclude the trial court would have held to this ruling had defendant pointed out the specific inadequacy raised on appeal. We do not believe, and defendant does not contend, that the trial court's pronouncement relieved her of the obligation to raise the specific grounds for objection to admission of the evidence under Evidence Code section 353.

omission to perform an act within the scope of duties the defendant voluntarily undertook to perform personally at trial." (*People v. Bloom, supra*, 48 Cal.3d at pp. 1226–1227.)

Defendant contends retained counsel should be held responsible because he failed to make the *Miranda* argument prior to the first trial, arguing the trial court incorporated its rulings from the first trial into the second. While we might find some merit in this argument if, at the second trial, the court had prohibited the making of new arguments on issues covered in rulings from the first trial, refused to reconsider rulings made at the first trial, or otherwise dogmatically held to those rulings, that was plainly not the case. On the contrary, the trial court's incorporation of proceedings from the first trial was merely a convenience, intended to relieve the attorneys of the burden of relitigating issues already raised and resolved.[10] Throughout the second trial, the court regularly permitted defendant to raise new legal arguments and even to revisit previously settled issues. In connection with the exclusion of her statements to police, for example, the court allowed defendant to reargue her contention the pre-*Miranda* statements should be suppressed. While the trial court initially told defendant admission of the post-*Miranda* statements was an issue of law that had been settled prior to the first trial, when defendant told the court she had "new evidence," the trial court heard defendant out and considered her new argument. Defendant was therefore free to raise new issues of law throughout the trial and was in no way bound by her retained counsel's failure to raise the *Miranda* issue prior to the first trial. For that reason, counsel's failure at the first trial to raise the issue was not the cause of defendant's failure to raise the issue at the second trial. There is no basis for a claim of ineffective assistance of counsel on this issue.

### 4. *Prejudice*

Even if the trial court's error in admitting defendant's statements on the prosecution's case-in-chief had been preserved for appeal, we would find no grounds for reversal because, under these circumstances, any error in the admission of those statements was not prejudicial to defendant. In making this determination, we apply the *Chapman* standard requiring reversal unless admission of the statements was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 21–22 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Lujan* (2001) 92 Cal.App.4th 1389, 1403 [112 Cal.Rptr.2d 769].)

The evidence of defendant's guilt, apart from her statements to police, was strong. In the days prior to the killing, defendant had made a number of

---

[10] The ruling was made prior to defendant's request to represent herself.

threats to kill Felix. Her son Gabriel, who witnessed the threats, took them seriously enough to fear for his father's life. Felix was similarly concerned. Felix was killed in the cottage behind defendant's house, while defendant was home. Her footprint was found in the dried blood, the shoe prints matched her size, and clumps of her hair were clenched in Felix's hands. Further, there was little or no evidence of self-defense, outside defendant's testimony. The combination of a blunt force wound to the back of the head, a single stab wound to the back, and the remaining stab wounds to the front suggested that defendant set upon Felix from the back. Moreover, she lacked the wounds that might have been expected had she been attacked. She did not report the killing to police, as would have been expected if she had acted in self-defense, falsely pretended ignorance to her son, and apparently took steps to cover up the killing. Defendant's statements to police, in which she confirmed the couple had marital problems but otherwise denied involvement in the killing, added no significantly inculpatory information to this evidence. Given the strength of the evidence of guilt, and the minimal inculpatory value of her statements to police, admission of those statements was harmless beyond a reasonable doubt.

Defendant contends admission of the statements was damaging because her various complaints about Felix to the interrogating officer revealed "[m]ultiple motives" to kill him. As an example, she cites her comments about Felix's success in obtaining custody of Eli, his reduction of support payments to her, his efforts to remove her from the family home, his remark to Gabriel she was crazy, and his success in winning away Gabriel's loyalty. Virtually all of these issues, however, were covered by the testimony of other witnesses, particularly Gabriel and Felix's attorney. There was ample evidence, apart from defendant's statements to police, that defendant felt herself wronged by Felix and bore extraordinarily angry feelings toward him at the time of the killing. Admission of these statements to police was therefore merely cumulative on issues that, to a large degree, were not even in dispute.

Defendant also argues "her false denials of any involvement in Felix's death suggested guilt." While this may be true, any suggestion of guilt was entirely the result of the strength of the evidence discussed above. Her denials to police were not inculpatory in themselves. If they suggested her guilt in context, it was only because of the strong evidence that she committed the killing.

In this regard, we do not consider as prejudicial any effect her statements to police might have had in refuting defendant's own testimony asserting self-defense. Defendant cannot rely on prejudice arising out of the tendency of the statements to rebut her own testimony because the statements would have been admissible to impeach that testimony, regardless of the *Miranda*

violation. (See *People v. DePriest* (2007) 42 Cal.4th 1, 32 [63 Cal.Rptr.3d 896, 163 P.3d 896] [voluntary confession obtained in violation of *Miranda* admissible for purposes of impeachment].)

Defendant contends admission of the statements was particularly harmful because the prosecution made them a "centerpiece" of its case. A review of the prosecutor's closing argument shows the true centerpiece of his case was the forensic evidence, which he argued heavily, along with defendant's prior threats against her husband. While defendant's statements were cited in closing argument, they were used to refute defendant's claim she acted in self-defense. As noted above, there can be no claim of prejudice regarding such a use of the statements, since they would have been admitted as impeachment evidence in response to her testimony.

Defendant acknowledges the statements would have been admissible as impeachment evidence, but she contends, citing our decision in *Bradford, supra*, 169 Cal.App.4th 843, that their admission can nonetheless be found prejudicial because she might not have testified had the statements not been admitted. In fact, we rejected this type of reasoning in *Bradford*. In that case, also a murder prosecution, the evidence, apart from the defendant's statements to police, would have supported any verdict from murder to voluntary manslaughter and was arguably consistent with a claim of self-defense. (*Id.* at p. 855.) The defendant's statements to police, however, were highly inculpatory, tending to rule out any defense for the killing. (*Id.* at pp. 849–850.) The defendant took the stand and claimed he acted in self-defense, but the jury rejected the testimony and convicted him of second degree murder. (*Id.* at p. 850.) We found prejudice, noting, "Because of the significant bearing of the confession on the crucial issue of defendant's mental state and the ample evidence that would have supported a finding of voluntary manslaughter rather than murder, we cannot say admission of the confession was harmless beyond a reasonable doubt." (*Id.* at p. 855.)

In *Bradford*, the Attorney General argued the statements to police should not be considered prejudicial because they would have been admitted to impeach the defendant's testimony in any event; the defendant responded he would not have testified if not for the need to counter his statements to police. We rejected both arguments, recognizing, "Whether defendant would have testified in the absence of the need to respond to his confession and, if so, whether the confession would have been admitted for purposes of impeachment requires us to engage in speculation about the parties' tactical choices. Because it is impossible to determine what might have happened had the trial proceeded differently, we conclude that prejudice should be evaluated on the basis of the evidence actually presented, while excluding the improperly admitted confession. On this basis, as noted above, we cannot find the

confession's admission to have been harmless beyond a reasonable doubt." (*Bradford, supra*, 169 Cal.App.4th at pp. 855–856.) For the same reason, we decline to speculate about defendant's decision to testify here and, as noted, find no prejudice "on the basis of the evidence actually presented, while excluding the improperly admitted confession." (*Id.* at p. 855.)

The two cases are otherwise poles apart. In *Bradford*, the defendant's statements to police were highly inculpatory, while the remaining evidence was ambiguous. Thus, the evidence presented, minus the statements to police, could have supported any one of several verdicts, arguably including acquittal. The defendant's statements to police were prejudicial because they tended to make the lesser verdicts much less probable by ruling out self-defense and heat of passion. In comparison, as discussed above, the evidence of guilt here was strong and unambiguous, and defendant's statements to police were not in themselves inculpatory. Accordingly, under the test we articulated in *Bradford*, admission of the statements was harmless beyond a reasonable doubt.

Finally, defendant argues that if the statements had been admitted solely for impeachment purposes during her testimony, rather than introduced in the prosecution's case-in-chief, they would have had less evidentiary force because she would have been entitled to a jury instruction precluding their consideration as proof of her guilt. (See, e.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 63 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Such an instruction, however, would have had little impact on the evidentiary significance of the statements. Their chief value was not to provide affirmative proof of defendant's guilt but to cast doubt on her exculpatory testimony of self-defense. As a result, introduction of the statements in the prosecution's case-in-chief, rather than as impeachment evidence, did not change their value as evidence.

D.–I.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

J. *Possible Juror Misconduct*

Defendant's new trial motion also included evidence suggesting juror misconduct. She contends the trial court abused its discretion in declining to conduct an evidentiary hearing with respect to the possibility of such misconduct.

---

*See footnote, *ante*, page 1183.

### 1. *Background*

The claim of possible misconduct was based on jurors' comments during a press conference conducted in the courthouse after the verdict was announced. The jurors were informed of the conference by the trial court while still in the courtroom, and the nine who elected to participate were escorted to the conference by court officials after the jury was discharged. In support of her claim of juror misconduct, defendant submitted a declaration from a spectator at the trial that day, stating the spectator "quickly made [her] way downstairs" to attend the press conference after the jurors were discharged. According to the spectator, the jurors who participated in the conference "arrived within minutes."

One of the topics addressed during the press conference was defendant's decision to act as her own attorney. When asked how her self-representation affected the jury's decisionmaking, one juror commented, "Well we all kind of talked about it, and we decided . . . that whether we liked her or not, umm, or her antics or not, was really not . . . a question for us. We didn't have to like her . . . to make a decision." When asked to evaluate her performance as counsel, two jurors expressed the opinion that defendant would have been better off with an attorney. After one juror noted defendant was "extremely smart," another said, "Well she's . . . very smart. And we've been asked— I've been asked that question a lot, . . . and I say that I think she would have been better off with representation." Responding to a followup question, the juror explained defendant was subject to frequent warnings from the court regarding the scope of her examinations and an attorney would have been more likely to stay on relevant topics and "maybe ma[k]e a lot of better points." The jurors nonetheless seemed to believe the evidence was sufficiently convincing that representation by an attorney would not have made a difference in their verdict.

After several questions about their decisionmaking process, discussion turned to the jurors themselves. In response to the question, "How do you feel about all the media attention," a woman juror said, "I want to respond to . . . we didn't read anything . . . we didn't watch anything . . . but we heard there were rumors that [a male juror] and I . . . [at this point, the juror made a gesture suggesting gossiping] . . . which is SO false. . . . He's getting married, loves his fiancé, so that's the only thing that the media was making stuff up, or if you weren't making it up, you know, exaggerating things, that were so far-fetched." The same juror later said the jury consented to the press conference because "we've not been allowed to talk for four months."

In declining to order an evidentiary hearing regarding the possibility of misconduct, the trial court noted, "There must be a threshold of some

evidence, not mere speculation, to justify an evidentiary hearing. . . . The hearing is not a discovery expedition to see what might happen and what might come out of it. [¶] In my opinion, there is no evidence here. There is merely speculation based on a couple of cryptic comments that were made during a press conference after the verdict was rendered. [¶] If I had been presented with declarations from former jurors or witnesses to misconduct that might be sufficient to then inquire further. Nothing has been presented here, in my opinion, that rises to the level of misconduct." The court also noted the possibility the jurors discussed the case with outsiders during the time between announcement of the verdict and the press conference, since they were led to the press conference through hallways "packed with media and spectators" and "were free to use their cell phones" during that time. The court concluded, "There is no showing in what has been presented to me that those two comments [on which the new trial motion was based] during the press conference don't reflect conversations between the jurors themselves about unrelated collateral matters . . . that occurred after the verdict."

### 2. *Discussion*

A defendant has the right to trial by unbiased, impartial jurors. (*People v. Nesler* (1997) 16 Cal.4th 561, 578 [66 Cal.Rptr.2d 454, 941 P.2d 87].) To preserve their impartiality, jurors are prohibited from discussing the case, even among themselves, until all evidence has been presented and the jury has retired to deliberate. (Pen. Code, § 1122, subd. (a); *People v. Wilson* (2008) 44 Cal.4th 758, 838 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) A violation of that prohibition through discussion with a nonjuror prior to rendering a verdict is viewed as serious juror misconduct. (*Wilson*, at p. 838.) "Juror misconduct gives rise to a presumption of prejudice [citation]; the prosecution must rebut the presumption by demonstrating 'there is no substantial likelihood that any juror was improperly influenced to the defendant's detriment' [citations]." (*People v. Gamache* (2010) 48 Cal.4th 347, 397 [106 Cal.Rptr.3d 771, 227 P.3d 342].)

The disapproval of juror conversations with nonjurors derives largely from the risk the juror will gain information about the case that was not presented at trial. (See, e.g., *In re Lucas* (2004) 33 Cal.4th 682, 696 [16 Cal.Rptr.3d 331, 94 P.3d 477].) Other types of juror misconduct, for example, include independently investigating the facts, bringing outside evidence into the jury room, injecting the juror's own expertise into the deliberations, and engaging in an experiment that produces new evidence. (*People v. Wilson, supra,* 44 Cal.4th at p. 829.) Prohibited juror conversations that result in the communication of extrinsic information are similarly regarded as presumptively prejudicial. On the other hand, where the juror conversations involve peripheral matters, rather than the issues to be resolved at trial, they are generally regarded as

nonprejudicial. (See, e.g., *People v. Wilson*, at pp. 839–840 ["trivial" comments to a fellow juror not prejudicial where not meant to persuade]; *People v. Page* (2008) 44 Cal.4th 1, 58–59 [79 Cal.Rptr.3d 4, 186 P.3d 395] [circulation of a cartoon in the jury room that did not bear on guilt not misconduct]; *People v. Avila* (2006) 38 Cal.4th 491, 605 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [juror statements disparaging counsel and the court not material because they have no bearing on guilt]; *People v. Stewart* (2004) 33 Cal.4th 425, 509–510 [15 Cal.Rptr.3d 656, 93 P.3d 271] [juror who complimented the appearance of the defendant's former girlfriend committed nonprejudicial misconduct]; *People v. Majors* (1998) 18 Cal.4th 385, 423–425 [75 Cal.Rptr.2d 684, 956 P.2d 1137] [general comments by jurors that did not address the evidence found not prejudicial]; *People v. Loot* (1998) 63 Cal.App.4th 694, 698–699 [74 Cal.Rptr.2d 324] [juror who asked a public defender whether the prosecutor was " 'available' " committed "technical," but nonprejudicial, misconduct].) When determining whether communications are prejudicial, the court must consider the " ' "nature and seriousness" ' " of the misconduct, particularly its connection with evidence extrinsic to the trial. (*People v. Wilson*, at p. 839, italics omitted.)

When a defendant has made a motion for a new trial based on juror misconduct, the trial court has the discretion to hold an evidentiary hearing to determine the validity of the charges if there are material, disputed issues of fact. Such a hearing is not to be used, however, as a " ' "fishing expedition" ' " to search for possible misconduct. (*People v. Avila, supra*, 38 Cal.4th at p. 604.) We review the trial court's decision to deny a hearing on juror misconduct for abuse of discretion. (*Ibid.*) When reviewing the trial court's denial of a motion for a new trial based on juror misconduct, we exercise independent review on the issue of prejudice, but we accept the trial court's findings of fact if based on substantial evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 809 [95 Cal.Rptr.3d 78, 209 P.3d 1].)

We find no abuse of discretion in the trial court's decision not to hold an evidentiary hearing on the charges of juror misconduct, largely because the matters purportedly discussed were not prejudicial. Although the first juror said he had been asked about defendant's decision to represent herself "a lot," there is no evidence the juror was asked this question by nonjurors. It is an issue the jurors likely would have discussed among themselves. In addition, as the court noted, there was time for him to discuss this issue with others between the jury's dismissal and the press conference, although, judging from the spectator's declaration, it was a fairly limited time. The case for misconduct was not substantial.

Even assuming the first juror had responded to questions on this issue by a nonjuror, however, this was, as the trial court noted, a "collateral" matter.

Whether defendant would have been better served by counsel was not an issue bearing on her actual guilt or innocence. There was no indication in the juror's statement at the press conference that he or any other juror had been exposed to information about defendant, the circumstances of the killing, or the witnesses at trial that was not admitted at trial. Nor did the juror indicate any belief defendant's performance as an attorney was related to the issue of her guilt. In these circumstances, any presumption of prejudice was rebutted because there is no substantial likelihood that any juror was improperly influenced to defendant's detriment by the suspected communications. In the absence of more conclusive evidence of *prejudicial* misconduct, there was no duty to hold a hearing.

The evidence suggesting the second juror, who spoke about media rumors of a romantic relationship between herself and another juror, committed misconduct was somewhat stronger. While she denied watching any media reports about the trial, she acknowledged that someone had told a juror about rumors in the media. Presumably, that person was a nonjuror who had watched the media reports. As the trial court noted, however, there was no way to know whether the communications occurred before or after the verdict was rendered.

More important, the issue discussed by the juror—a rumor among the press that she was romantically involved with another juror—had nothing to do with defendant's guilt and bore no plausible relation to the jurors' deliberations. In the context of the trial, it was trivial, and there was no possibility of prejudice to defendant as a result of the presumed communications. Accordingly, the trial court properly denied the motion for a hearing on misconduct. (See, e.g., *People v. Wilson, supra,* 44 Cal.4th at p. 840.)

Defendant's arguments that many more jurors could have been involved in extrajudicial communications and that the jurors might have learned other things as a result of their communications are simple speculation, unsupported by any evidence. There is no basis for inferring that, because the jurors had conversations on particular topics, they had additional conversations on other, unrelated topics, as defendant argues. Further, there is no basis for defendant's speculation the jurors themselves might have watched media reports. The second juror stated expressly that they had not heard or seen any such reports. The trial court was not required to order a hearing merely on the basis of speculation. (See *People v. Avila, supra,* 38 Cal.4th at pp. 604–605.)

K. *Reimbursement of County Expenses*

Defendant contends the trial court erred in failing to hold a hearing to determine her ability to pay before ordering her to reimburse the County for defense costs it incurred on her behalf.

## 1. *Background*

Prior to the second trial, defendant executed a promissory note to pay the County "the sum as fixed by the Superior Court for Court Appointed Counsel services and for any other cost related to my defense." Performance under the note was secured by a deed of trust against defendant's interest in the Orinda home she owned with Felix, purchased in 2000. In 2006, their respective interests were partitioned at the request of his estate, and in June 2007, a referee was appointed to sell the home.

In August 2007, six months after defendant's sentencing, the County filed a motion for an order requiring her to reimburse the County for the costs of defense it had incurred on her behalf, set at nearly $220,000. The County argued defendant had both a contractual obligation to reimburse, based on the promissory note she executed, and a statutory obligation under Penal Code section 987.8. Although the home had not been sold at the time the motion was filed, it was listed at $2 million. The County argued defendant had the ability to reimburse the costs in full because, according to a schedule it submitted, she would receive more than $230,000 even if the home sold for only two-thirds of the asking price.[21]

Defendant filed an opposition to the motion, disputing certain of the County's expenses, arguing she had signed the lien "under duress" and had "revoked it the next day," and asserting she had been found to be, and was, indigent. In other filings and argument before the court, defendant contended she should be found financially unable to reimburse the County for its costs because she was incarcerated, lacked funds, and had no way to earn money.

Although subdivision (b) of Penal Code[22] section 987.8 permits the court to order reimbursement of defense costs only if a defendant is found to have the "present ability" to pay them, the trial court declined to make a determination of defendant's ability to repay the County's expenses. The court explained it viewed itself as proceeding under subdivision (a) of section 987.8, which establishes a procedure for securing the reimbursement of fees for court-appointed counsel through an attachment of property. The court interpreted subdivision (a) as requiring an initial hearing to determine whether the defendant was unable to employ counsel, and, if so, whether the defendant possessed property that could be used to secure reimbursement of fees. Once that determination had been made, in the court's view, the defendant was responsible for reimbursing defense costs to the extent of the value of the secured property.

---

[21] It is not clear from the record whether the house has since been sold or, if so, what was the final monetary value of defendant's interest.

[22] All further statutory references are to the Penal Code unless otherwise indicated.

After hearing testimony regarding the various charges claimed by the County, the trial court found the reimbursable costs to be \$212,033, and set that amount as the value of the lien on defendant's interest in the home. The trial court's determination of the amount of reimbursable costs is not challenged on appeal.

### 2. *Legal Background*

■ Section 987.8 establishes the means for a county to recover some or all of the costs of defense expended on behalf of an indigent criminal defendant. (*Schaffer v. Superior Court* (2010) 185 Cal.App.4th 1235, 1245 [111 Cal.Rptr.3d 245].) Under subdivisions (b) and (c) of the statute, an order of reimbursement can be made only if the court concludes, after notice and an evidentiary hearing, that the defendant has "the present ability . . . to pay all or a portion" of the defense costs. (§ 987.8, subds. (b), (c), (e); *People v. Amor* (1974) 12 Cal.3d 20, 29 [114 Cal.Rptr. 765, 523 P.2d 1173]; *People v. Phillips* (1994) 25 Cal.App.4th 62, 72–73 [30 Cal.Rptr.2d 321].)[23] If this finding is made, "the court shall set the amount to be reimbursed and order the defendant to pay the sum to the county in the manner in which the court believes reasonable and compatible with the defendant's financial ability." (§ 987.8, subd. (e).)

■ "Ability to pay" means "the overall capability" of the defendant to reimburse all or a portion of the defense costs. (§ 987.8, subd. (g)(2).) It requires consideration of the defendant's financial position at the time of the hearing, his or her "reasonably discernible" financial position over the subsequent six months, including the likelihood of employment during that time, and "[a]ny other factor or factors which may bear upon the defendant's financial capability to reimburse the county." (§ 987.8, subd. (g)(2)(A)–(D).)[24] In

---

[23] Section 987.8, subdivision (b) (hereafter subdivision (b)) states: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, or upon the withdrawal of the public defender or appointed private counsel, the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided."

Because there is no evidence in the record the County ever adopted a resolution adopting the reimbursement provisions of section 987.8, subdivision (c), a prerequisite under the subdivision, we do not consider it on this appeal.

[24] The statute anticipates that a defendant's financial position will be determined at the time of sentencing. (*People v. Phillips, supra,* 25 Cal.App.4th at p. 73.) It is not clear whether a defendant's future earning potential may be included when, as here, the section 987.8 motion is filed six months after sentencing. Defendant has not challenged the timing of the motion.

calculating ability to pay, "the court [must] consider what resources the defendant has available and which of those resources can support the required payment," including both the defendant's likely income and his or her assets. (*People v. Smith* (2000) 81 Cal.App.4th 630, 642 [96 Cal.Rptr.2d 856]; see, e.g., *Conservatorship of Rand* (1996) 49 Cal.App.4th 835, 842 [57 Cal.Rptr.2d 119] [bank account]; *People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1394 [44 Cal.Rptr.2d 501] [real property]; but see *People v. McDowell* (1977) 74 Cal.App.3d 1, 4 [141 Cal.Rptr. 124] [possibility of a future insurance recovery cannot be considered].)

■ Section 987.8, subdivision (a) (hereafter subdivision (a)), on which the trial court relied in denying a hearing on defendant's ability to pay, addresses security for the reimbursement of defense costs.[25] Under subdivision (a), when a court finds "that a defendant is entitled to counsel but is unable to employ counsel," the court may cause to be determined "whether the defendant owns or has an interest in any real property or other assets subject to attachment." If so, the court can impose a lien on the property, to the extent otherwise permitted by law, and the county may later foreclose on the lien. (*Ibid.*)

### 3. *Discussion*

■ We conclude the trial court's compliance with subdivision (a) did not avoid the need for a hearing into defendant's "present ability" to pay under subdivision (b). As discussed below, subdivision (a) provides a means for securing reimbursement of defense costs, but it is not an independent basis for awarding reimbursement. As a result, a trial court must comply with the remaining provisions of section 987.8, including making a determination of ability to pay under subdivision (b), before reimbursement may be granted.

---

[25] Subdivision (a) states: "Upon a finding by the court that a defendant is entitled to counsel but is unable to employ counsel, the court may hold a hearing or, in its discretion, order the defendant to appear before a county officer designated by the court, to determine whether the defendant owns or has an interest in any real property or other assets subject to attachment and not otherwise exempt by law. The court may impose a lien on any real property owned by the defendant, or in which the defendant has an interest to the extent permitted by law. The lien shall contain a legal description of the property, shall be recorded with the county recorder in the county or counties in which the property is located, and shall have priority over subsequently recorded liens or encumbrances. The county shall have the right to enforce its lien for the payment of providing legal assistance to an indigent defendant in the same manner as other lienholders by way of attachment, except that a county shall not enforce its lien on a defendant's principal place of residence pursuant to a writ of execution. No lien shall be effective as against a bona fide purchaser without notice of the lien."

### a. Enforcement of the Promissory Note

The Attorney General first contends a determination of defendant's ability to pay was unnecessary because the promissory note constituted a contract to reimburse costs that can be enforced regardless of defendant's ability to pay.

During argument on the motion, defendant and the trial judge disagreed over the circumstances of the execution of the promissory note. Defendant contended she had executed the note after having been found to be entitled to appointment of counsel as a result of her indigence. The trial judge, speaking from his own memory of events, recalled no finding of indigence.[26] According to the judge, after defendant began acting pro se, she asked to be assisted by her prior attorney, rather than the public defender. The attorney declined to accept as payment a security interest in defendant's home, however, and defendant apparently had no money to pay him. The court recalled that, in order to secure her choice of counsel, defendant agreed to execute the secured promissory note, granting the County reimbursement for his fees from the proceeds of the sale of the home, if the County would pay the attorney.[27]

■ While the Attorney General may be correct that the promissory note constituted an enforceable contractual obligation to reimburse the County's defense costs, this would not provide a basis for affirming the trial court's order. Contracts are enforced through civil proceedings, following the filing of a complaint and service of process. Neither the Penal Code nor the promissory note contains a provision waiving or abbreviating normal civil process for the enforcement of this type of contractual obligation. (See *Bradley v. Superior Court* (1957) 48 Cal.2d 509, 519–520 [310 P.2d 634] [spousal support obligation in property settlement could not be enforced through criminal contempt proceedings].)

Although section 987.8 provides statutory authority for the court to order a criminal defendant to reimburse defense costs, any such order must be made pursuant to its provisions. Section 987.8 makes no mention of a contract between a county and the defendant. Conversely, there is no statutory provision for an award of damages for breach of contract through a summary proceeding in the criminal court, the procedure invoked by the County to obtain reimbursement. In the absence of any legal authority permitting enforcement of the promissory note in this manner, the County was required to proceed in the civil courts, providing defendant the opportunity to raise her

---

[26] The trial judge who presided at this hearing was not the same judge who presided at defendant's trial.

[27] Notwithstanding this exchange, the trial court took no evidence regarding the circumstances under which the note was executed and made no formal findings regarding the transaction.

objections to payment as defenses in a civil action. Because the trial court could not enter an order of reimbursement on a theory of contract in this proceeding, we cannot affirm the court's order on that basis.

### b. *Section 987.8*

The Attorney General also argues, echoing the trial court's reasoning, that an "ability-to-pay" hearing was unnecessary because the County had followed the procedures for obtaining a lien under subdivision (a). The absence of any reference to a defendant's ability to pay in subdivision (a), it is argued, "demonstrates that the Legislature did not intend to impose an ability-to-pay requirement in cases where the defendant had signed a promissory note secured by a lien on real property."

 The rules governing statutory construction are familiar. " ' " '[A]s with any statute, we strive to ascertain and effectuate the Legislature's intent.' " [Citations.] "Because statutory language 'generally provide[s] the most reliable indicator' of that intent [citations], we turn to the words themselves, giving them their 'usual and ordinary meanings' and construing them in context [citation]." [Citation.] If the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs. [Citation.] If, however, the statutory language is susceptible of more than one reasonable construction, we can look to legislative history in aid of ascertaining legislative intent.' " (*People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 708–709 [61 Cal.Rptr.3d 689, 161 P.3d 198].)

Subdivision (a) allows the trial court, upon "a finding . . . that a defendant is entitled to counsel but is unable to employ counsel," to order a hearing to inquire into the defendant's ownership of attachable real property. Unlike a hearing pursuant to subdivision (b), which occurs only after the conclusion of proceedings, a subdivision (a) hearing can occur at any time. If such property is found, the court may impose a lien. The county thereafter is granted "the right to enforce its lien for the payment of providing legal assistance to an indigent defendant" in the same manner as any lienholder. (Subd. (a).) The language of the subdivision does not expressly state that it is an alternative to the procedures described in the remainder of section 987.8, nor does it state that lien foreclosure can proceed independent of a determination under subdivision (b) that cost reimbursement is appropriate because the defendant has a "present ability" to pay.

Subdivision (a) is lacking important provisions one would expect if it provided a basis for reimbursement of defense costs independent of the procedures in the remainder of the statute. Most prominently, although subdivision (a) states the county may "enforce its lien for the payment of

providing legal assistance to an indigent defendant," there is no provision for determining the amount of the defendant's obligation, either the amount of defense costs incurred by the county or the share of those costs the defendant is required to reimburse. As a result, subdivision (a) lacks any provision for determining the amount of the costs that can be recovered upon lien foreclosure. Similarly, subdivision (a) does not provide for the entry of an order requiring repayment. Enforcement of a lien for the payment of defense costs would be difficult, if not impossible, without some type of order or judgment establishing the debt. Given these omissions, subdivision (a) arguably lacks the due process guarantees required before an indigent defendant can be charged for the costs of his or her defense. (E.g., *People v. Amor, supra*, 12 Cal.3d at p. 29 [implying the requirement of notice and a hearing into an earlier version of § 987.8 as a matter of constitutional necessity]; *People v. Phillips, supra*, 25 Cal.App.4th at pp. 72–73.)

The trial court assumed that, in the absence of any provision for determining the amount of recoverable defense costs, cost recovery is permitted up to the value of the lien interest in the property. The language of subdivision (a), however, contains no such direction. More important, under the trial court's interpretation the statute provides no authority for the reimbursement of defense costs that exceed the value of the lien interest in the property. The trial court held the County was limited in its recovery of costs to the value of the lien interest, but there is nothing in the statutory language requiring such a limit. Further, there is no reason why, if a defendant is financially able to reimburse the county from other income sources, the county should be so limited in its recovery.

These problems are avoided if the remaining subdivisions of section 987.8 are interpreted as supplying the content missing from subdivision (a). Under this interpretation, subdivision (a) allows the court to impose a lien on a defendant's assets early in the criminal proceedings, when the decision to provide counsel is made, thereby securing later reimbursement. The remaining provisions of section 987.8 provide for the determination and documentation of the amount of the obligation for which the subdivision (a) lien provides security. These subdivisions describe the means for determining the collectible amount of the defendant's debt, prescribe the procedural requirements applicable to that determination, and provide for the entry of an enforceable order requiring payment. This reading, of course, requires the trial court to find the defendant has a "present ability" to pay before an order of repayment can be entered, regardless of whether a subdivision (a) lien has been secured. (§ 987.8, subds. (b), (e).) Given the incomplete nature of subdivision (a), the Legislature does not appear to have intended it as an alternative to the remainder of the statutory procedures, but rather as a supplement.

While not conclusive, the statutory history of subdivision (a) provides support for this reading. Subdivision (a) was added in 1988, at a time when the other provisions of section 987.8 already existed in substantially their present form. (Stats. 1988, ch. 871, § 1, p. 2807.) It was intended to ensure that if counsel was appointed for a defendant who owned real property but had insufficient liquid assets to pay an attorney, reimbursement for public expenditures on counsel could be obtained at a later date from the defendant's property. As a Senate committee analysis of the bill stated, the purpose of the amendment was "to facilitate the recapture of expenditures arising from the defense of individuals entitled to counsel at public cost." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2577 (1987–1988 Reg. Sess.) Apr. 26, 1988, p. 2.)

As originally proposed, the subdivision would have amended not section 987.8, but section 987, which governs the appointment of counsel. Subdivision (c) of section 987 permits the court to require a defendant to execute a financial statement to assist the court in determining "whether a defendant is able to employ counsel." With substantially its current language, subdivision (a) was to be added as a new subdivision "(d)" of section 987, permitting a hearing with respect to attachable assets in addition to the financial statement required under subdivision (c). (Sen. Bill No. 2577 (1987–1988 Reg. Sess.) as introduced Feb. 19, 1988.) In this form, the subdivision appears to have been envisioned as an alternative to the procedures of section 987.8. (See Sen. Com. on Judiciary, Analysis of Sen. Bill No. 2577 (1987–1988 Reg. Sess.) Apr. 26, 1988, p. 1.)

As so constituted, the bill was criticized both because the existence of two means for obtaining reimbursement "will be confusing to the judicial system" and because the bill "present[ed] a significant equal protection problem," lacking the procedural guarantees of section 987.8. (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 2577 (1987–1988 Reg. Sess.) Aug. 1, 1988, p. 3.) Prior to enactment, the bill was amended to insert the new provision in its present location as subdivision (a) of section 987.8, rather than in section 987. The legislative history contains no explanation for this change of codification, but it is plausible to conclude the insertion into section 987.8 was intended to address the two criticisms by incorporating subdivision (a) into the existing section 987.8 procedures. By integrating the provision for security in subdivision (a) into section 987.8, the change removed the possibility of confusion arising from the creation of a second means for determining reimbursement. In addition, by making subdivision (a) subject to the procedural protections already present in section 987.8, the change

removed any constitutional concerns.[28] Incorporating subdivision (a) into section 987.8 did not impair the purpose envisioned for it, since the new provision continued to provide counties a means for aiding the recapture of defense costs.

■ Requiring a hearing into a defendant's ability to pay prior to the enforcement of a lien for repayment of defense costs is consistent with the overall statutory scheme. By enacting section 987.8 to govern reimbursement of defense costs, the Legislature demonstrated its intent to require reimbursement only from those defendants with the means to repay. While the ownership of attachable real property is certainly evidence of an ability to repay, it is not conclusive. A trial court could determine, for example, that forced sale of a personal residence would bring extreme hardship on a defendant's dependents. Alternatively, if the attached property supports an income-producing asset, such as a personal business, seizure of the real property to satisfy a defense cost obligation could compromise the defendant's livelihood and jeopardize his or her rehabilitation. There is no indication in subdivision (a) the Legislature intended the real property of a defendant to be sold without regard to the impact of the seizure on the defendant's family, life, or livelihood, the nature of the asset, or the defendant's other personal and financial circumstances. Requiring a hearing into these matters by virtue of subdivision (b) prevents an inflexible and potentially counterproductive application of the attachment provisions of subdivision (a).

In the present circumstances, our holding may be largely academic. Defendant, serving an indeterminate prison term with a minimum duration of 16 years, owns an asset that appears to be sufficient to cover her debt to the County. Based on this evidence, the trial court may well conclude defendant has the present ability to pay the debt. Nonetheless, defendant is entitled to a hearing at which she can present evidence and argument to persuade the court that, notwithstanding the value of her interest in the home and her present circumstances, she should not be required to reimburse all or a portion of the County's expenses.[29]

---

[28] Following the amendment, the Governor sought and obtained an opinion from the Legislative Counsel that the bill was constitutional. (Legis. Counsel, letter to Governor George Deukmejian re Sen. Bill No. 2577 (1987–1988 Reg. Sess.) Aug. 31, 1988.) This supports the inference the amendment was sought to address constitutional concerns.

[29] Because defendant is a state prisoner, it has been held that the trial court must make an express finding of "unusual circumstances" before requiring her to repay the County. (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1537 [29 Cal.Rptr.3d 586]; see § 987.8, subd. (g)(2)(B).) The *Lopez* holding may, however, be unnecessarily broad in these circumstances. The basis for the holding is a portion of subdivision (g)(2)(B) of section 987.8, which states that a defendant who has been sentenced to state prison is deemed not to have a "reasonably discernible future financial ability" to repay defense costs in the absence of "unusual circumstances." Although *Lopez* held that this statement applies generally to the obligation to reimburse defense costs, its

## III. DISPOSITION

The trial court's judgment of conviction is affirmed, but the court's order requiring reimbursement of the County's defense costs is vacated. The matter is remanded to the trial court solely for the purpose of holding a hearing to determine defendant's present ability to pay all or a portion of the $212,033 in reimbursable defense costs determined by the trial court and entering an appropriate order under section 987.8, subdivision (e).

Dondero, J., and Banke, J., concurred.

A petition for a rehearing was denied January 4, 2011, and appellant's petition for review by the Supreme Court was denied March 30, 2011, S189900.

---

placement within subdivision (g)(2)(B) suggests it was intended only to apply to the determination of the prisoner's future prospects for income, the specific concern of subdivision (g)(2)(B). The provision does not appear to apply to the prisoner's "present financial position" (§ 987.8, subd. (g)(2)(A)) or the "other factor or factors which may bear upon the defendant's financial capability to reimburse the county" (*id.*, subd. (g)(2)(D)), the critical determinations in these circumstances.