Filed 2/10/22  P. v. Vue CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHERFAPU TONY VUE,<br><br>Defendant and Appellant. | C080269<br><br>(Super. Ct. No. 12F04118) |

Defendant Cherfapu Tony Vue was convicted after a jury trial of 10 counts of sexually molesting two minor victims, his nieces.  He was sentenced to 12 years plus 90 years to life.  On appeal, he contends his statements to the police should have been suppressed because they were obtained in violation of *Miranda*[1] and because they were involuntary.

---

[1]  *Miranda v. Arizona* (1969) 396 U.S. 868 [24 L.Ed.2d 122] (*Miranda*).

1

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Trial Evidence

The victims, M. and D., were defendant's step-niece and biological niece. At the time of trial, M. was 17 and going into her senior year of high school. D. was 10, going into the fifth grade. Defendant began molesting M. when she was nine or ten years old. He began molesting D. when she was five or six. Suffice it to say at this point in the opinion that both victims testified at length establishing multiple acts of sexual molestation by defendant. Other evidence included passages translated from recorded conversations defendant had with his mother in Hmong at the police station, including his admission that he touched and licked the victims' vaginas.[2] Also, the victims' grandmother observed concerning behavior and the two victims made disclosures to her.

And the prosecution introduced a video recording of an interview defendant gave to Sacramento Police Department Detective Dean Lawrie on June 12, 2012, which was played to the jury.[3] It is the admissibility of this interview that is at issue in this appeal. We discuss what was said during this interview in more detail, *post*.

---

[2] Defendant does not challenge the admissibility of these statements.

[3] A transcript was given to the jurors when the recording was played for them. While the recording was admitted into evidence during the trial, the transcript was not. However, the transcript of this interview and the prior interviews are in the record on appeal. Both parties refer to and cite those transcripts. Consequently, so do we. We have watched the recorded interviews that took place on June 12, 2012, and where there are relevant discrepancies between the transcript and what we hear on the recording, we refer to what we hear on the recording.

2

**Verdicts and Sentence**

The jury found defendant guilty as to the following: counts 1 and 2, oral copulation of D., a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b));[4] counts 3 and 4, lewd and lascivious acts with D., a child under 14 (§ 288, subd. (a)); counts 5 through 8, oral copulation of M., a child 10 years of age or younger (§ 288.7, subd. (b)); and counts 9 and 10, lewd and lascivious acts with M., a child under 14 (§ 288, subd. (a)).

The trial court sentenced defendant to 12 years plus 90 years to life.

## DISCUSSION

### I. The Parties' Contentions

Defendant contends the trial court erred by denying his motion to suppress his statements because: (1) the objective circumstances show that he was subjected to custodial interrogation before he was given the *Miranda* warnings, and (2) Detective Darlene Killip, who administered the polygraph examination, employed additional deceptive tactics identified by *Miranda* that purportedly rendered defendant's later statements to Detective Lawrie involuntary. He also contends the *Miranda* violation was prejudicial beyond a reasonable doubt because the prosecution relied heavily on his confession in its closing argument.

The Attorney General replies: (1) defendant was not in custody before he received *Miranda* warnings; (2) defendant has forfeited any general involuntariness argument because his motion in the trial court alleged only a *Miranda* violation, but even if not forfeited, defendant's involuntariness argument lacks merit; (3) any error in introducing the statements the jury heard was harmless given the totality of the evidence, including

---

[4] Undesignated statutory references are to the Penal Code.

3

the victims' testimony and defendant's confession to his mother, which defendant does not challenge here.

We conclude that defendant was not in custody for purposes of *Miranda* during his interview with Killip and much of the following interview with Detective Lawrie. Further, his post-*Miranda* statements were admissible. His involuntariness claim is forfeited because it was not raised in the trial court. Lastly, we conclude that any error in admitting the statements made between the point when the interview became custodial and when defendant was *Mirandized* was harmless, given the other admissible evidence in the case. Further, even assuming it was error to allow the post-*Miranda* statements, any such error was harmless as well.

## II. Additional Background

Only the June 12, 2012,[5] interview with Detective Lawrie was introduced into evidence during the trial. In addition to that interview, two prior interviews are pertinent to the issues presented here: a May 2 interview with Lawrie and a June 12 interview and polygraph examination with Killip, which took place before Lawrie's interview of that same day.

### A. The May 2 Interview with Detective Lawrie

On May 2, Lawrie interviewed defendant at the police station. Lawrie began by saying, "I appreciate you coming down . . . as we spoke on the phone earlier, this is a voluntary interview." He continued, "If at any time you . . . don't wanna talk to me, Vue, you are free to leave."[6] He told defendant he would get him a ride back to work if

---

[5] All dates were in 2012.

[6] Although the trial court did not reference considering the preliminary hearing transcript in its decision on defendant's motion to suppress, we note that Lawrie testified at the preliminary hearing that defendant scheduled a "volunteer interview" and appeared at the police station on his own. The parties appear to agree that defendant came to the police station on his own on both May 2 and June 12.

4

needed.  Lawrie explained, "this is a chance for you to come down and tell your side of the story."  He continued, "if you get mad or you're pissed off at me or you wanna stop the interview, just let me know.  I'll escort you back out, we'll call a cab, take you back to work."

Lawrie then obtained background information, including that defendant was as a full-time babysitter for his brother's four children.  Lawrie asked whether defendant had ever been arrested or gone to jail.  Defendant asked, "Am I going to jail?"  Lawrie said, "No – no, like I told you earlier, you're not gonna go to jail."  Defendant responded, "Depend on what I say, right?"  Lawrie replied, "No, either way you're not gonna go to jail.  That's today, that's you get to leave anytime."  Defendant responded, "That is for today, right?"  Lawrie explained, "at some point in time, it is *possible that you, they'll send you to jail if the – if the DA follows up on the stuff from CPS, like I told you*."[7] (Italics added.)

The detective resumed questioning defendant about his family, and then asked about sexual subjects, eliciting a description of defendant's tastes in pornography.  The detective asked whether defendant had masturbated in the victims' presence or showed them pornography and he denied both.

Eventually, Lawrie told defendant that M. said he had licked her vagina. Defendant denied it and suggested she might have made that up because he had caught her acting out sexually with boys at school.  Lawrie told defendant that D. had also said he had licked her vagina.  She also said defendant had rubbed his penis on her vagina and her "butt," and defendant denied those allegations as well.  Asked why the girls would say these things if they were not true, defendant said he was sometimes "kind of mean" to

---

[7] Neither party called any witnesses during the *Miranda* hearing.  Thus, the record of the *Miranda* hearing does not show exactly when Lawrie previously talked to defendant about these things or specifically what he said.

them because his brother had given him permission to discipline them when he babysat. Lawrie told defendant the victims were talking about his pornography and said that he masturbated and licked their vaginas and that he put his penis around D's vagina and butt. Again, defendant denied the conduct.

Lawrie told defendant, "The way these cases kind of work is I get their side, I get your side, and thanks for coming in, I appreciate it. . . . [¶] [B]ut right now there is, it's having your word against their word and it's two against you. So one way that you could clear your name, or try to clear your name, is by taking a polygraph exam. It's like a lie detector test." Defendant expressed interest in doing so and asked how long it would take. Lawrie determined a polygrapher was not available at that time and told defendant he would make an appointment for him.

Lawrie asked defendant if there was anything else defendant wanted to tell him and defendant said no. Lawrie then told defendant, "let's go out front, we'll get a cab ordered up for you."

### B. June 12 Interview/Polygraph Session with Detective Killip

Detective Killip began the session by saying she had "talked to the detective a little bit. He said you wanted to take a polygraph, there were some allegations." She then talked with defendant for approximately an hour and a half before administering the exam. She explained that she had to hear his version of what was going on to make up the test questions. However, most of the pre-test interview involved general background discussion, what defendant knew about polygraphs, and an explanation regarding how the

6

polygraph works and how the test would be administered.[8]  In addition, Killip asked defendant general health questions.[9]

Killip explained that the polygraph is a voluntary test, "100% voluntary," and that neither she nor the detective could make anybody take the test.  Defendant responded that he figured if he did not take the test, it would make it look like he was hiding something.  Killip explained that the detective got a lot of cases like this and the "only way that he can be sure that you did not do what they are saying you did is to pass a polygraph test, and people come in and pass all the time."  She again emphasized the test was voluntary

---

[8]  The general background discussion included:  defendant's military experience, his family members and family relations, and how his parents disciplined him for lying when he was a child.  Defendant said he had taken a polygraph test in the military and passed.  Also, when discussing how the polygraph worked, defendant admitted that he researched polygraph examinations on the Internet, including YouTube.  He explained some of what he had learned about how the test is administered and how to beat it.

[9]  Killip explained she was going to ask some medical questions to make sure defendant was "medically okay to take the test."  Questions posed concerned defendant's general medical and mental health history, medications, the amount of sleep he got the night before, when he last ate, whether he used illegal drugs in the last week or alcohol in the last 24 hours.  After asking these questions, eight minutes into the interview, Killip asked defendant if he had any other general health problems, and defendant smiled and responded, "no, just — I'm just, I have an anxiety attack right now."  Killip said, "You're nervous?"  Still smiling, defendant responded, "Yeah."  Killip said, "That's okay" and explained that everyone is nervous when they come for a polygraph.  Defendant nodded affirmatively and said, "yeah."  She explained nervousness will not make a person fail a polygraph and defendant nodded affirmatively and said, "Alright."  Killip further explained she expects people who take the test to be nervous.  Smiling, defendant asked, "do I look like I'm nervous right now?"  Killip responded, "No."

  At oral argument, appellate counsel, for the first time, made much of defendant saying he was having an "anxiety attack."  Based on the exchange and defendant's demeanor, it appears that defendant was indicating he was nervous, not that he was having some sort of mental health related anxiety issue.  Based on our review of the recording, we do not find defendant's statement about having an "anxiety attack" to be anything more than an expression of nervousness; nor do we find the statement to be probative of the issues we decide here.

and she could not make anyone take it. She added, "you won't be able to clear your name for the detective, okay, but . . . I'm not going to force you to take the test." Defendant responded with what appears to be a joking remark: "like I don't care, if you just stand up I'll walk out right now because you know what, I'm just here answering questions." Defendant chuckled. Killip responded, "*you can leave if you want to leave*" and "I'm not here to make anybody take a test." (Italics added.) Defendant said, "I don't feel like – like trying to run out, then the detective just tackles me down," to which Killip responded, "No, no, no. That's not how it's going to be. . . Like I said this, is a voluntary test, *you are not under arrest. When we're done, you're leaving*." (Italics added.) Defendant then said, so "basically . . . what I do here, . . . it's gonna to make him have his decision, right?" Killip responded, "Well, yes, whether he should still concentrate on you or move on to somebody else, because . . . the detectives have to have . . . a way to clear people."

Defendant then asked, "when I pass the test, is there a way that I could get like some kind of proof saying that I passed my polygraph?" Killip explained there was no such mechanism and that defendant should talk to the detective about such questions; it would be up to the detective to decide whether to release that information. Killip returned to discussion about how the polygraph works. About 40 minutes into the interview, she presented defendant with a "polygraph advisement form," which defendant signed.[10]

---

[10] The form reads, in pertinent part, as follows: "**Sacramento Police Department** [¶] **Consent to undergo polygraph examination or lie detector test** [¶] I, [defendant], by these presents, being of sound mind and body and *without duress, coercion or promises of immunity or reward or promises of any kind whatsoever, hereby voluntarily agree, consent, and assent* to the submission of my person to the polygraph test or examination, more commonly known as the lie detector test. In so consenting, I understand and am fully aware of, the meaning, nature and purpose of said test. [¶] *I acknowledge that I have been advised by the undersigned witness* [*Detective Killip*] *of my*

Killip asked defendant what were the allegations that were being made against him. He said M. and D. claimed he masturbated in front of them, put his penis on their private parts, and licked their private parts. Defendant acknowledged he masturbated in his bedroom at the house, and said sometimes the kids entered without knocking. Killip began to explain the questions she would ask him, and mentioned the question of whether he put his mouth on anybody's vagina. She asked defendant what questions he would like her to ask, and he responded, "anything that could clear my name."[11]

Killip asked defendant about his relationship with M. She also asked about any occasions where innocent touching might have been misinterpreted by M. and defendant described innocent circumstances.

Killip told defendant one of the test questions would be whether his mouth ever touched M.'s vagina. In response to Killip's question whether that seemed like a reasonable question, defendant said, "yes." Shortly before the test was administered regarding M., defendant asked, "So what happens if I fail this test?" Killip responded, "You're not going to fail the test, right?" Defendant said, "No, but --." Killip said they would clear up the issue with M. and then talk about D., and added, "[L]et's just focus on one thing first and make it easy for you."

During the administration of the test, just before starting the second round of questions, Killip asked defendant, "All right. You ready for another one? Is your hand feeling okay?" Defendant said, "Yeah." Killip then said, "*Get you done, so you can get out of here*." (Italics added.) Defendant lifted his hand and Killip said, "Okay, hand

---

*right to consult an attorney now and throughout all further proceedings in this case and of my right to remain silent. I fully understand these rights but desire nevertheless to submit to the polygraph examination.*" (Italics added.)

[11] Defendant also suggested the following question: "[H]ave I ever done anything like wrongfully to the kids that would put me . . . that would jeopardize my . . . future." He added, "That would be an awesome question."

down," and then said, "I'm just gonna adjust this." Killip adjusted the connections on defendant.[12]

After the test concerning M. concluded, Killip went over the results with defendant. It was then about two hours into defendant's time with Killip. Killip showed defendant the result indicated by the computer and asked him what it said. He answered, "Deception indicated." Killip asked, "Do you know what that means?" Defendant responded, "I'm lying?" Killip answered, "That means you're not being 100% honest." Defendant responded, "Okay." Killip said, "So, we should probably talk about this a little bit." Defendant replied, "Okay."

Detective Killip said, "So what's bothering you about the test? I mean obviously . . . something happened with [M.] [¶] And now's kind of the time we're gonna need to discuss it." Defendant responded, "Okay." Killip's tone was as it had been throughout the morning, low-key, casual, and conversational.

Killip continued, "So why don't you tell me what happened. Look, people make mistakes all the time. Doesn't mean you're a bad person, it just means you had an error in judgment, okay. . . . [¶] You're not at this drag them in the bushes, rape and pillage and kill, okay. . . . I think you just kind of made a mistake. You know, you've got some young girls in the house there. Um, you know, 12, 13, ten-year-olds, they're starting to develop, okay, and you're probably like every other guy, you know, when you see a young girl, things just -- emotions take over, you know, testosterone takes over. So, why don't you tell me what happened. I don't want to put words into your mouth but, you know, obviously something went on with you guys. Was it just a mistake? I mean I

_____

[12] The transcript does not include all of this discussion. After defendant responded, "Yeah" to the question about his hand feeling okay, the transcript reads: [Killip]: (Unintelligible). Okay. Now I'm just gonna adjust this." Where the transcript says "Unintelligible," we hear "*Get you done, so you can get out of here*" and "Let's see, okay, hand down." (Italics added.)

10

don't think you intentionally meant to hurt her at all."  Killip's tone was still low-key, casual, and conversational.

Defendant put his head down, raised it back up, and said, "It was a mistake.  It was, she was asking questions like - like what happens to my body when it changes, like — like why does a guy do this, what does a guy do that."  He continued, "I was just trying to—trying to show her . . . how things were."  He said he "just went too far and - and now I'm paying the price."  Killip said, "Ok, so you just made a mistake.  You weren't trying to hurt anybody or anything," and defendant agreed, saying, "I wasn't trying to hurt her.  I was trying to . . . teach her too so."  Killip responded that what defendant said made sense and asked, "So, did you lick her vagina?"  Defendant said yes, but "[n]ot very often."  He said he only did it "whenever she asked me – like, 'I have a strange feeling.  I don't know what it is, you know.' "

Killip asked whether the same thing happened with D., and defendant replied, "No, It was just, uh, like eventually I just like started having that -- like I just needed it, you know."  Detective Killip responded, "That sometimes happens with guys.  You guys have hormones that take over, testosterone, um, a little bit different from women but I mean it happens.  I have a son that's just a few years younger than you, so trust me, I've heard it all.  This isn't the first time, stuff – and people make mistakes.  You know.  People experiment, you know.  Unfortunately, you have to pick somebody a little bit older."  Defendant replied, "I know . . . every time I did that, I would feel like I was such a horrible man.  I had to do something to hurt myself in order to – to like not think about it, you know?"

Killip asked, "Were you feeling bad about yourself?"  Defendant said, "Yeah" and explained he had attempted suicide three or four times "cause I was so pissed - so mad at myself, you know, because . . . like I know it was wrong, I shouldn't be doing this . . . But after a while . . . I tried to take my life a couple of times and my brother caught me. . ."  In a consoling tone, Killip told defendant, "nothing's that bad that you have to

11

hurt yourself." Replying in an argumentative tone, defendant declared, "Yeah, it is though. No, it is."

Continuing in a consoling tone, Killip responded, "Let me tell you how it is. Today is going to be the first day of the rest of your life, okay, I mean really." Defendant interrupted, "Today's the last day that I will ever feel free," to which Killip responded, "Today, you are free because you're finally telling the truth." Defendant insisted, "No, no, I'm not." Killip continued in a consoling tone, "Listen. Doesn't it feel better — I mean when people hold a secret inside them, that's what makes them feel bad. It's like cancer, it just eats away at you. I bet you've been feeling bad about this for a long time." Defendant responded, "I know now they're gonna go over there and tell them the bad news, and then they're gonna go over and arrest me and and that's it, you know. . ."

Detective Killip interrupted, "Okay. Let me explain. *I wasn't lying. When you're done here today, you're leaving.*" (Italics added.) Killip continued, "I'm not gonna tell the detective, I'm gonna let you do that, okay. Because it's not gonna mean anything coming from me, but I'm sure you're sorry for what you did, right? You sound like you are. Are you sorry you made a mistake?" (Italics added.) Defendant replied, "Yes." Killip said, "Ok, absolutely. Do you think you should tell the detective that?" Killip continued, "Look, everybody makes mistakes. Okay, I'm telling you," to which defendant responded, "And everybody just has to pay for it, right?" Killip responded, "I don't know what's gonna happen in the future. I honestly don't know. That's something you're gonna have to talk to Detective Lawrie about."

Defendant told Killip, "now, since I said the truth, I basically - *when I get home, my brother's gonna go, well of course . . . my brother's gonna go ape shit.*" (Italics added.) Defendant said there would probably be fighting and "Nobody can ever trust me again." He then said, "[N]ow, I just feel like I want to kill myself now. . . No, no, I want to kill myself now."

12

In response to Killip's exhortations that this was "not the end of the world," defendant responded, "It is the end of the world though." After discussing his family's anticipated reaction, defendant said, "So *if I leave*, I cannot go home and hang myself?" Killip said, "Don't do that," to which defendant responded, "I have to." Killip said if he did that, the victims would feel responsible for the rest of their lives. She said they would feel like they killed their uncle and she suggested the family needed to work together to heal. Defendant said, "But that's after I pay for what I did, right?" Killip responded, "You want to talk to the detective and ask him those questions? It's gonna be more appropriate, okay. Cause it's his case, I don't really know anything about it except what we talked about today, okay. So, it's gonna be probably a little more appropriate for you to kind of. I want you to tell him the truth, okay. I don't want to . . . put any words in your mouth. I want you to tell him the truth. Does that sound like something that you can do?" Defendant responded, "Yeah." Killip said, defendant seemed like a "pretty nice guy" and she did not want to see anything bad happen to him. She continued, "sometimes we just make stupid mistakes. If you're teaching that, they're a little too young. Don't do it again. You may have to apologize, you know. That would probably be a good thing." Killip said, "I'm gonna let you talk to the detective."

Defendant put his head in his hand and said, "Yeah, I'm ready to go to jail." Detective Killip replied, "*You're not going to jail. Aren't you going to work when you leave here*?" (Italics added.) Defendant, replied, "No." Killip followed up, "*Do you have to work today?*" (Italics added.) Defendant said, "Yes." Killip asked what time defendant had to be at work. Defendant responded, "What time is it now? . . . I got to tell my mom. *She's going to make me walk home*." (Italics added.) Killip replied, "I'll have the detective come talk to you. Let's do that and then you can ask him questions that you need to ask." Killip then called Lawrie and told him defendant "would like to talk to you in an interview room if you have time."

Killip then said to defendant, in a conversational tone, "Alright, so let's do that. Why don't you talk to him, okay, and he's going to ask you some questions and you know what? Let's just be honest with him, okay?" Defendant looked up at Killip and said, "Okay."

Killip suggested defendant talking to Lawrie would be better than if she spoke to Lawrie, and then she said, "Just tell him the way you told me, okay. *But you're leaving when you're done here today*." (Italics added.) Defendant responded, "Until they get a warrant on me." Killip replied, "That's up to him, whatever they're gonna do. Yeah. I don't have any idea because I do polygraphs."

When Lawrie entered, Killip said, "[Defendant] would like to let you know how he did on the test, he wants to talk to you about a few things." Lawrie invited defendant to "talk in the room in private, how's that?" Killip told defendant it was nice meeting him and wished him luck. Defendant responded, "All right. Thank you."

## C. June 12 Interview with Detective Lawrie

### 1. Statements Made Before *Miranda*

Throughout the interview, Lawrie's tone, as reflected in the recording, was like Killip's – low-key, casual and conversational. The interview began by Lawrie stating, "You came in for a volunteer polygraph today. How'd it go?" Defendant replied, "Not so good. Not so good." Lawrie asked, "What does that mean?" Defendant replied, "I messed up. I lied to you." Defendant continued, "I'm admitting to my faults.[13] [¶] Now I understand I have to pay the price . . . and I understand this is gonna be a slow process and to me recovering from what I did and - and basically now . . . ."

---

[13] The word "fault" (singular) appears in the transcript. We hear defendant say the word "faults" (plural) in the recording.

Lawrie interrupted and indicated Killip was paging him and left the interview room. During this time, defendant took his glasses off and put his hands over his face. When Lawrie returned, he apologized for interrupting and asked defendant to finish.

Defendant continued, "And I know it's gonna be a - a slow but long process for me to recover, but at least it'll give the girls a chance . . . to heal now after me admitting. I understand that . . . everybody makes minor mistakes in their life and what I did is basically unforgivable to any kind of parents out -- outside of this world -- this life -- whatever. And you know . . . I'm at that point where I should be on suicide watch. . . . [¶] Because *if I go home*, I will do something . . . [¶] . . . to hurt myself and I know if I do that, it's gonna make -- they'll feel responsible for my death." (Italics added.)

Lawrie told defendant, "Okay, well, let's do this. . . . I don't know exactly what transpired in that room, but let's dissect it a little bit at a time and when we're done here . . . I'll get you whatever help you want and need. So if that's something you wanna do, then we'll – then we'll take one step, but . . . I know it's gotta make you feel a lot better that you . . . ." Defendant interrupted, "[W]ell, actually after admitting it, you know, I'm back to that point where I know I did somethin[g] wrong . . . [¶] and like I just — like I just don't wanna live no more."[14] Lawrie told defendant, "[N]othing's that bad, okay?" Defendant responded, "Well I put so much pressure on me to where, I guess, I like up here and just fall back down [gesturing with his hand in an up position and then a down position], I just like try to step in front of cars for no reason at all, you know."

Lawrie said, "let's go back a little bit and then we'll deal with each thing. You came in here and you said you lied to me. . . . I'm assuming the last time I interviewed you, right?" Defendant nodded affirmatively.

---

[14] The transcript indicates "unintelligible" where we hear defendant saying the words "actually after admitting it."

Lawrie said he did not hold any grudges because defendant lied to him. He told defendant he thought more of him now because he was telling the truth, and then asked, "So, what happened between you and [M.]?" Defendant said "she came to that age where she was asking questions" about sexual things. He said M. was 12 or 13 years old and he was in his late twenties. He said he showed her his penis, then "what excites a girl," touching her vagina with his fingers, masturbating her. Sometimes he would have "that urge" to masturbate himself simultaneously. This happened "[p]robably a couple times." Defendant said he also put his mouth on her vagina "a couple times."

After M. moved out, defendant said he "finally became addicted . . . [¶] . . . to be a pedophile and [D.] was there and it just happened." Lawrie said, "So tell me how that started." Defendant said D. slept in his bed with him when she was little because she was scared. Lawrie asked what kind of things he did to D. Defendant replied, when she was five or six years old, he "touched her and . . . licked her vagina and that was it." He said he did each act "[j]ust a couple times." When he licked her vagina, she was awake. He admitted he rubbed his penis around the edges of her vagina, but "[n]ot a lot." He said she was five or six and he was 29. He denied rubbing his penis around her rectum or having her touch his penis.

Defendant ejaculated onto a towel while performing these acts with the victims "maybe 10 to 15 times." He had M. touch his penis with her hands and her mouth "[l]ess than three or four times."

Defendant denied any sexual activity with S., M.'s cousin. He also denied watching pornography with the victims.

Detective Lawrie suggested that "a lot of times it makes people feel better to write down something" and asked, "would it make you feel better, like, write a letter to M. and D., - just kind of explaining that you're sorry and how you feel about doing this?" Defendant said, "I don't feel like doing that right now." Lawrie said, "okay, no problem." Lawrie said he felt better that defendant "got this off [his] chest," and

16

defendant interrupted, "I know you feel better, but that's about it. . . .  [¶]  I know I fucked up and I know now I have to pay the price . . . [¶] and hope that this will never happen again."

Lawrie asked about pornography.  Defendant said he had animation pornography. He denied viewing other types of pornography.

Returning to D., Lawrie asked about the time of day those events happened. Defendant said both day and nighttime, always in the bedroom.  He denied D. touched his penis.  Only M. did.

Lawrie told defendant his mother was outside and asked, "Do you think we should have your mom come in or do you want to talk to her in private?"  Defendant said, "I think she should come and hear what I have to say in front of you. . . .  [¶]  And we can try to figure out what happens next."

Lawrie left the interview room and discovered defendant's mother had left the police department and gone home.  Lawrie called and asked her to come back.  Lawrie asked defendant whether he felt like "writing anything to the girls right now so there'd be something [Lawrie] could get them."  Defendant agreed to do so.  Lawrie provided paper and a pen and left the room.

Lawrie later returned and read the letter defendant had written aloud:  "D[.] and [M.], there are  . . . not enough words in the world that describes how much forgiveness I have to ask you.  As we all know, if you do something bad, you have to pay the price for it because all bad people belong in hell, and surely enough, that is where I am heading.  I don't accept any form of forgiveness from you both as it doesn't exist for me.  I just hope both of you girls enjoy your life more that you have succeeded in putting a bad guy away. Enjoy your life and stop thinking about me.  That is all I ask.  Sincerely, a bad guy." Immediately after Lawrie read the last line, defendant said, "Yeah.  That's what I am."

Lawrie asked defendant if he was still feeling like hurting himself.  Defendant said, "[T]he suicidal part kind a like went away."  Lawrie then told defendant he had

17

talked to his supervisor. He continued, "I don't feel comfortable, um, without gettin' you some kind of help, okay? Uh, I just -- *I don't feel comfortable lettin' you go*, you know, you talk about runnin' out in front of a car there, you talked about hanging yourself from a tree I guess when you talked to [Killip]."[15] (Italics added.) Defendant said, "I'm more calmed down now." Lawrie said he could see that, but was still worried about defendant. Defendant said, "I'm just ready for my mom to come in here so I can tell her. . . [¶] the kind of person I am. . . . [¶] And after that, we can talk about what'll happen to me — what's gonna happen this next couple of days to (unintelligible) years of my life." Detective Lawrie asked defendant what he thought should happen to him, and defendant talked about getting therapy in "a place for like where, you know, pedophiles go."

Lawrie asked if there had been other victims; defendant said no. Lawrie asked whether defendant would have persisted if the victims had not moved out; defendant said "yeah" and he would "probably been dead a long time ago." He said he would have committed suicide. He explained, "whenever I did somethin' like that, I would feel horrible, you know. I would feel like, 'What am I doing? I need to stop,' you know." Defendant said he had cut himself out of guilt. He also said he tried to hang himself. However, he denied that he would harm himself in jail. He said he would just "try to serve what I have to serve."

Lawrie asked defendant if he went to jail and could talk to a psychiatrist there, would that make him feel better. Defendant responded, "Yes. . . [¶] As long as — cause you know, I just wanna be separated from the outside world right now." The detective said he would talk to his supervisor and get defendant into a place where they could help him. In the meantime, they would wait for defendant's mother to arrive. Defendant

---

[15] As we discuss *post*, we conclude defendant was in custody for purposes of *Miranda* beginning at this point.

18

assured Lawrie he was okay, and he was just going to take a nap and wait for his mother and "for you guys to say, 'alright, let's book this mother fucker.' "

Defendant's mother arrived and entered the room with Lawrie. She and defendant began speaking in Hmong. Lawrie asked if they could speak English. Thereafter, he asked defendant to tell his mother what he wanted to tell her. Defendant said, "Mom, I'm sorry, but I lied to you and I did those things to [D.] and [M.]. And . . . I'm not goin' home tonight, ever again, until I go to court, serve my time and whatever." He told her he needed "help, therapy and psychiatric help because I wanna hurt myself . . . [¶] and if nothin happens, and then *if I was to go home with you*, I would have done something to where [M.] and [D.] would have felt responsible for causing me to kill myself." (Italics added.) He asked the detective whether he would go straight to prison. The detective said first defendant would "go down there today and do some paperwork," then they would try to get him whatever services he needed, and then he would get a court date and decide whether to plead or stand trial.

Lawrie explained to defendant's mother that defendant had failed his polygraph test. He then told her, "afterwards, we talked and he's admitted to doing these bad things." Lawrie further explained, "*the reason he's gonna go to jail today is because he feels he's gonna kill himself* . . . and he's told me that several times. He's told the other officer that and our concern is for [defendant] cause we don't want him to harm himself. . . . *So in his safety right now, he's gonna go to jail*." (Italics added.)

Defendant's mother asked, "So how long he gonna go to the jail?" Lawrie explained the legal process without estimating defendant's eventual custody time. Lawrie left defendant and his mother alone in the interview room, where they spoke in Hmong for more than 20 minutes. During the beginning of their discussion, defendant began to get emotional and his mother told him, in English, "calm down, calm down, calm down, okay?" Defendant did.

19

After the detective came back in, he said. "I'm gonna sit and talk to you a little more. How about we have your mom go out there for a minute, she can digest everything, and then I'll go talk to her, but I'd like to talk to you."

**2. The *Miranda* Advisements and Defendant's Post-advisement Statement**

After defendant's mother left the room, Lawrie said, "So couple things I wanna clean up here. Um, you know, you came down here today, . . . *you've been askin' me to take a . . . polygraph exam*, um, it was voluntary, um, you knew that -- we knew that. And right now since, you're technically in custody cause I'm going take you to jail like we talked about.[16] I wanna. . . I didn't really take any notes,[17] so I wanna make couple and I'm a read your rights real quick, I wanna talk to you real quick, clean up a couple questions I have. I'll then answer any question you have, we can bring your mom back in if you want . . . [¶] and then we'll go from there, okay?"

The detective continued, "So, uh, this is just a format affidavit"[18] and read defendant the *Miranda* advisements. After each right, he asked defendant if understood and defendant said "yes" each time.

Lawrie asked, "So just to clean some stuff up, um, you said when you started doin' things with [M.], she was how old?" Defendant said, "Like between 9 to 12." Lawrie asked, "And tell me what things . . . happened between you and her." Defendant said, "I touched her vagina with my fingers." In response to Lawrie's question about how many

---

[16] The transcript indicates Lawrie said, "And right now since you're — tend to be in custody cause I'm gonna take you to jail, uh, we talked about." We hear Lawrie as saying, "And right now since, you're technically in custody cause I'm going take you to jail like we talked about."

[17] The transcript indicates Lawrie said, "I'm gonna — I need to be able to take your notes." We hear Lawrie as stating, "I wanna. — I didn't really take any notes, so I wanna make a couple. . . ."

[18] This passage is difficult to hear, so we simply note what is in the transcript.

20

times, defendant responded, "Estimation -- no more than 20 to 30 times." Lawrie asked, "Now what else happened?" Defendant said, "I put my mouth on her vagina." He said he did so "20 to 30 times." In response to Lawrie's question, "[w]hat else happened," defendant replied, "I used my tongue on her vagina." Again, he said he did this "20 to 30 times." Defendant acknowledged he was in his late twenties — 27 to 29 — when this occurred, and he knew these things were wrong when he was doing them.

Lawrie asked whether M. had touched defendant's penis with her hand. He said she had two or three times. M. also touched his penis with her mouth two or three times. He denied ejaculating on those occasions, but admitted doing so when he touched or licked M.'s vagina "about 20 [times]."

Lawrie then turned to D. Defendant said he touched D.'s vagina, put his mouth on her vagina, and put his tongue on her vagina "[l]ike 10 to 20 times" when she was four to six years old. She never touched his penis, although he asked her to do so "maybe less than five times." She always said no, "it's yucky. I don't wanna touch it." He rubbed his penis around her vagina "less than ten times." It never went inside. He never thought about doing so. He never ejaculated on either M. or D.'s body.

Lawrie turned back to S. Defendant denied anything happened with S. However, he later admitted touching her breasts and rubbing her vagina over clothes when she was 16 and he was 28.

Lawrie asked whether there was anything else defendant wanted to tell him. Defendant replied, "I wanna thank you personally. . ." He explained if he would have been the uncle "that I'm supposed to be, then none of this would of never happened." He continued, "[I]f I didn't have those perverted thoughts and stuff . . . none of this would have never happened. . . . [¶] . . . [¶] I know I understand I messed up and I know I'm gonna pay the prices for it and I hope those girls — the two girls move on . . . I'm gonna stop myself from entering their lives." Defendant said he did not deserve to live anymore. But later he said he was sorry and hoped he could start his "road to recovery."

21

The interview went on a while longer, but without any additional factual admissions. Thereafter, defendant spoke to his mother.

## D. Defendant's *Miranda* Motion

Defendant filed a "motion to suppress defendant's statements pursuant to *Miranda v. Arizona*." (Capitalization omitted.) All of the argument headings cited *Miranda*, and all of the arguments thereunder addressed only *Miranda*.

The trial court considered the video recordings and transcripts of the interviews. The recording of Lawrie's June 12 interview was admitted and played for the jury.

## E. *Miranda* Hearing Argument

Defendant argued the facts showed custodial interrogation without benefit of *Miranda* warnings. Defense counsel first argued defendant was in custody after Killip "began to question the veracity and validity of [defendant's] statement." Counsel went on, "once [defendant] started making statements to Detective Killip that were admissions, as well as statement[s] that he was going to engage in self-harm, that it was pretty clear at that point in time that he was not going to be able to leave." He was in custody from the time he told Killip he was going to injure himself and was ready to go to jail, because it was clear the detectives would not let him leave then. Instead of reading him his rights or telling him he could discontinue the questioning, Detective Killip continued to interrogate him, then "directed him to go with [Detective] Lawrie into another room and tell him what happened." Under those circumstances a reasonable person could not have felt free to leave.

Defendant further argued the officers had "used interrogation techniques to pressure [defendant] such as lying about evidence and using what was most likely a fake polygraph exam."[19] The interrogation revealed that the officers considered defendant a

---

[19] The defense did not call Killip to testify at the *Miranda* hearing and there is no evidence that the polygraph examination was a "fake."

22

suspect. All this showed an "intentional plan on the part of detectives" which "underscores . . . the fact that the interrogation had an end goal of effectuating an arrest."

Defendant contended, "In sum, the totality of circumstances . . . overwhelmingly demonstrates that [defendant] was in custody: while he went there voluntarily and was told he was not in custody, the express purpose of the interview was to question him as a suspect. The interview took place at the police station. [Defendant]'s conduct did not indicate an awareness that he was free to leave. He never left the interview room except when escorted by [Detective] Lawrie from the polygraph room to another interview room. The interview lasted . . . several hours. Detectives dominated and controlled the course of the interview. Detectives manifested a belief that [defendant] was culpable and repeatedly told him that. Police used interrogation techniques such as lying to [defendant] and used a purported polygraph examination to pressure him. [Defendant] was arrested at the end of the interview."

In addition to the above points concerning *Miranda* custody, citing *Missouri v. Seibert* (2004) 542 U.S. 600 [159 L.Ed.2d 643] (*Seibert*), defense counsel argued the detectives' failure to read defendant his *Miranda* rights until after obtaining a confession showed a deliberate plan to evade *Miranda*, which would make the subsequent *Mirandized* confession inadmissible. Counsel asserted that defendant's statements before and after the *Miranda* warnings were essentially part of a "seamless conversation" between defendant and Detective Lawrie, with only minutes separating the original confession from its *Mirandized* recapitulation. The belated *Miranda* warnings therefore did not cure the previous failure to warn.

The prosecution argued defendant's decision to take the polygraph examination was the voluntary result of his first interview with Lawrie. Killip repeatedly assured defendant he was free to leave — not only before the exam, but afterward. Contrary to defense counsel's assertion, Killip did not interrogate defendant for two hours, because a good part of the session consisted of preliminary discussion about the examination. After

23

he completed the test, defendant said he wanted to talk to Lawrie. No force was used. From beginning to end, defendant did most of the talking, beginning with "I lied to you"; thus, there was no true interrogation. The detectives did not use pressure techniques or fabricate evidence. Far from coercing defendant, everyone there, including defendant's mother, was sympathetic to him and tried to calm him down. It was only after they failed to do so or to get him to stop threatening self-harm that Lawrie decided he could not let defendant leave and gave him the *Miranda* warnings.

Defense counsel suggested that before Lawrie took defendant into the other room, he had decided he would not let defendant leave because of his talk about hurting himself and that this decision was relevant to whether Lawrie should have given *Miranda* warnings then. Counsel asserted that, as mentioned in his written motion, Lawrie testified at the preliminary hearing that "once he began hearing [defendant] make statements to the effect that he was going to engage in self-injurious behavior, that he had formed the opinion that he wasn't going to let him leave the station at that point in time."[20] He stated Lawrie had monitored defendant's interview with Killip and the polygraph examination.

---

[20] In the written motion, defense counsel cited page 44, lines 13-20 of the preliminary hearing transcript. There was no stipulation between the parties that the trial court could consider the preliminary hearing testimony in deciding the *Miranda* motion and the trial court did not mention that testimony in its written ruling. Because of the argument defense counsel made in the trial court, we have, nevertheless, reviewed the pertinent preliminary hearing testimony. At the cited page, the following questions and answers appear in the transcript:

"Defense Counsel: I apologize for skipping around but I wanted to go back to something that you said on direct. [¶] Because you said *at some point* when [defendant] was indicating that he wanted to hurt himself about what he — essentially over what he had done, you were concerned that he was a danger possibly to himself and others?

"Lawrie: Yes.

24

The trial court questioned whether *Miranda* warnings would be required "even if the defendant is completely unaware of the potential of arrest." Defense counsel responded that defendant was not unaware of it, which is why he told Killip he was ready to go to jail. That impression was confirmed after the interview with Lawrie began. Furthermore, the fact that Lawrie was monitoring the polygraph session indicated its real intent was "to create a scenario where the police would have an opportunity to interrogate

---

"Defense Counsel: And that was *at that point* that you decided . . . I need to not let this guy leave?

"Lawrie: That is correct." (Italics added.)

During the direct examination referenced in the above questions, the following question and answer appear in the transcript:

"Prosecutor: After you read [defendant] his *Miranda* rights and was there a particular reason why you decided that it was necessary not to allow [defendant] to leave?

"Lawrie: Yeah. *At that point in time* I had had lengthy conversation with [defendant]. I felt he was a threat to himself and others after he started talking about wanting to injury [*sic*] himself and confessing to some of these accusations that I didn't — I knew I wasn't going to let him leave *at that point in time*. [¶] So I read him his Miranda rights in my mind knowing that he was not free to leave and then we continued with the interview." (Italics added.)

Defense counsel's cross-examination questions above referenced "at some point" and "at this point," but this testimony does not reflect when specifically during the interviews the "point" came when Lawrie decided he would not let defendant leave. If anything, the direct examination suggests that that point occurred just before Lawrie *Mirandized* defendant. Later, cross-examination testimony appears to confirm this. Lawrie testified: "I brought him into the other room. Once he started confessing and I realized that he was a danger to himself or possibly someone else, that's when I backed out of the room, I came back in, I read him his Miranda rights."

In any event, the record is clear that Lawrie did not say anything to defendant or otherwise indicate his intent not to let defendant leave until the point in time during the interview that Lawrie expressly told defendant he was not going to let him go because of his threats to commit suicide. This "point" in time was before Lawrie Mirandized defendant and it is the point in time we conclude the interview became custodial.

25

or confront [defendant] regarding the allegations in connection with this case[,] and that that was furthered when they moved him down . . . to another room where that further questioning occurred." Whether the polygraph exam was real or fake, "the designed purpose was to conduct an interrogation of [defendant]."

The trial court stated the officers' "purpose" did not matter so long as the situation did not amount to custodial interrogation and asked whether Killip had indicated to defendant that he could leave whenever he wanted. The prosecutor said: "Yes." Defense counsel replied that Killip said, toward the end of the session: " 'Oh, no, at the end of this you can leave here and go back to work,' " whereupon defendant said, " 'But the warrant's going to get issued for my arrest, right? I'm going to get arrested,' " and Detective Killip answered: " 'Well, I can't really talk to you about that. You're going to have to talk to the other detective.' "

The trial court said that, even if defendant was told a warrant for his arrest would issue, "that's a future event," not a recognition that he was going to be arrested then and there. The court took the matter under submission to watch the video recordings.

### F. The Trial Court's Ruling on the *Miranda* Motion

The trial court entered a written ruling as follows: "Having now viewed portions of Defendant's Exhibits A, and C, read the entirety of Defendant's Exhibits A-1 and C-1, and B, and having heard both counsels' arguments at in limine proceedings, and considered all pleadings related thereto, the court rules as follows: [¶] The Motion to Suppress Defendant's statements pursuant to Miranda v. Arizona, is DENIED. [¶] Defendant's statements were uncoerced, voluntary, and not the product of a custodial interrogation."

### G. *Miranda* Custody

#### 1. *Miranda* Custody Principles

When a suspect is subjected to custodial interrogation, *Miranda* warnings are required, and any incriminating statement made without such warnings will be

26

inadmissible to establish guilt.  (*Miranda v. Arizona* (1966) 384 U.S. 436, 444.)  But not every statement under interrogation is made in custody.  (*Ibid*.; *People v. Mickey* (1991) 54 Cal.3d 612, 648.)

An interrogation is custodial for *Miranda* purposes "when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.]  Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.  [Citations.]  When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his situation." (*People v. Moore* (2011) 51 Cal.4th 386, 394-395 (*Moore*).)  The question to be resolved is " 'would a reasonable person in the suspect's position during the interrogation experience a restraint on his or her freedom of movement to the degree normally associated with a formal arrest[?]' " (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 35, quoting *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera*).)  "[W]e accept the trial court's findings of historical fact if supported by substantial evidence but independently determine whether the interrogation was 'custodial.' " (*Aguilera*, at p. 1161.)

The high court has provided significant guidance in this area.  The only relevant inquiry is how a reasonable person in the suspect's position would have understood their situation.  (*Yarborough v. Alvarado* (2004) 541 U.S. 652, 662 [158 L.Ed.2d 938, 950] (*Yarborough*).)  The court has emphasized that the subjective perception of the suspect is not relevant.  (*Stansbury v. California* (1994) 511 U.S. 318, 323 [128 L.Ed.2d 293] (*Stansbury*).)  The high court has explained:  "[A]n objective test [is] preferable to a subjective test in part because it does not ' "place upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question." ' " (*Yarborough,* at p. 662.)

Nor is the subjective intent of the officers regarding the suspect's custodial status relevant, if not disclosed to the suspect.  (*Stansbury, supra,* 511 U.S. at p. 323.)  " '[A]

policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time.' " (*Id*. at pp. 323-324.) Furthermore, whether the person being interviewed is the focus of the investigation is not a relevant consideration. (*Id.* at pp. 319, 324, 325 ["We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody"].) Indeed, "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." (*Id*. at p. 325)

California appellate courts have identified a number of factors to consider in the totality of the circumstances test. (*Aguilera, supra*, 51 Cal.App.4th at p. 1162; accord, *People v. Torres* (2018) 25 Cal.App.5th 162, 172-173; *People v. Saldana* (2018) 19 Cal.App.5th 432, 455 (*Saldana*); *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404 (*Pilster*).) This court has considered the same list of factors. (*In re I.F.* (2018) 20 Cal.App.5th 735, 759.) These factors are: (1) whether the contact with law enforcement was initiated by the police, and if so, whether the person voluntarily agreed to an interview; (2) whether the express purpose of the interview was to question the person as a witness or a suspect; (3) where the interview took place; (4) whether police informed the person that he was under arrest or in custody; (5) whether the police informed the person that he was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; (6) whether there were restrictions on the person's freedom of movement during the interview; (7) how long the interrogation lasted; (8) how many police officers participated; (9) whether police dominated and controlled the course of the interrogation; (10) whether they manifested a belief that the person was culpable and they had evidence to prove it; (11) whether the police were aggressive, confrontational, and/or accusatory; (12) whether the police used interrogation techniques to pressure the suspect; (13) and whether the person

was arrested at the end of the interrogation. (See, e.g., *ibid*., quoting *Aguilera*, at p. 1162.)

"No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) We do not focus solely on isolated statements made by the police during the interrogation. The totality of the circumstances "must be considered as a whole." (*Pilster*, *supra,* 138 Cal.App.4th at p. 1403.)

## 2. Totality of the Circumstances Analysis

Defendant appears to assert he was in custody from the point in time that he made incriminating statements to Killip. In his briefing, the Attorney General responds defendant was not in custody until Detective Lawrie gave the *Miranda* warnings. We conclude defendant was in custody for purposes of *Miranda* from the point that Lawrie told defendant he was not letting defendant leave because of his suicidal mental state.

Looking to the *Aguilera* factors, we note the following: defendant came to the police station on his own; he voluntarily agreed to a polygraph examination; he was told numerous times that he was not required to talk to the officers, not required to take the polygraph test and was not under arrest; neither detective was aggressive nor confrontational — to the contrary, their tone was low-key, casual and conversational and, at times, they were empathetic and consoling; and the officer-to-suspect ratio was one-to-one during the interviews. Before discussing in more detail the pertinent circumstances that demonstrate a reasonable person would not have "experienced a restraint tantamount to an arrest" (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162), we discuss a recent case that is factually similar to the instant case, in which another panel of this court held the defendant was not in *Miranda* custody.

In *People v. Potter* (2021) 66 Cal.App.5th 528 (*Potter*), the defendant was accused of sexually molesting his daughter and admitted the molestations during a polygraph interview at a police station. (*Id*. at p. 531.) After the victim disclosed the sexual abuse, a detective called defendant on the phone and asked him questions concerning the allegations. (*Id*. at p. 532.) After denying the allegations, the investigating detective suggested the defendant should tell the truth about what happened, adding " 'You're essentially calling [the victim] a liar.' " (*Id*. at p. 533.) Eventually, the detective asked the defendant if he would be willing to come to the police station for a polygraph examination. (*Ibid*.) Defendant agreed and appeared for the examination two weeks later. (*Ibid*.)

The polygraph was to be conducted by a second detective. At the beginning of the pre-test interview, that detective told the defendant, " 'you don't have to talk to me if you don't want,' " and " '[y]ou can walk out anytime you want.' " (*Potter*, *supra*, 66 Cal.App.5th at p. 533.) The pre-test interview generally followed the same lines as in the instant case — an explanation of how the polygraph worked, the defendant's understanding of the allegations against him, and his family history and relations background. (*Id*. at pp. 533-534.) However, they also discussed the fact that the defendant had been molested as a child. (*Id.* at p. 534.) Also, at one point, while devising the relevant polygraph questions, the detective told the defendant he did not think the victim was lying. (*Ibid*.) The detective suggested a reasonable explanation might be "regression," where the defendant had not dealt with his own sexual abuse. (*Id.* at p. 535.) He told the defendant that his daughter deserved to know this was not going to happen to her again. (*Ibid*.) The defendant said his molester never apologized. (*Ibid*.) The detective told the defendant his daughter would have to live with what happened for the rest of her life "until she has some sort of closure." He added, "and you're her dad. And you — and that's your job and your responsibility." (*Ibid*.) The detective asserted that the victim deserved an explanation. (*Id*. at p. 536.) He asked defendant to tell him

30

what happened so he could understand. (*Ibid.*)  The defendant explained that his sexual abuse issue " 'never really got fixed,' " and the detective said he hoped the defendant would have a talk with his daughter when the time came. (*Ibid.*)  The detective asked when was the first time the defendant had done something to his daughter.  Thereafter, the defendant made incriminating statements, admitting acts of sexual abuse in response to questions by the detective.  (*Id.* at pp. 536-538.)

No polygraph examination was conducted.  After speaking with that detective, the defendant was moved to another interview room where he made admissions to the original detective.  (*Potter*, *supra*, 66 Cal.App.5th at p. 538.)  At one point, the defendant wrote an apology letter to his daughter.  (*Ibid.*)  The defendant was allowed to leave the police station after the interviews and was arrested three days later.  (*Id.* at p. 539.)  The *Potter* court concluded the defendant was not in custody for purposes of *Miranda* when he was interrogated at the police station.  (*Id.* at p. 544.)  We discuss some of the *Potter* court's reasoning below in the context of the circumstances presented in the instant case.

### a. Voluntary Agreement to be Interviewed

Defendant twice appeared at the police station on his own to speak to police.  He first voluntarily came to the police station on May 2 to talk to Lawrie.  Thereafter, defendant was allowed to go home.  Over a month went by during which defendant was not arrested.  On June 12, he again voluntarily appeared — this time for a polygraph.  The details on how this was arranged are not clear as neither party elicited testimony at the *Miranda* hearing on this subject.  But the recorded interviews demonstrate defendant appeared voluntarily.

In *Potter*, the court found the defendant's voluntary appearance to be a significant factor.  The court wrote:  "[the] defendant went to the police station voluntarily.  He did so to take a polygraph examination, apparently in the hope of passing the examination and thereby convincing law enforcement that he did not molest his daughter.  For purposes of the *Miranda* analysis, we perceive no material difference between arriving at

31

the station voluntarily to give a statement and doing so to take a polygraph examination. Taking a polygraph examination involves answering a series of background and potentially incriminating questions while connected to the polygraph machine." (*Potter*, *supra*, 66 Cal.App.5th at p. 541.) Significantly, Potter came to the police station on his own two weeks after speaking to the original detective on the phone. (*Ibid.*)

These circumstances in *Potter* essentially mirror what happened here. We too find it significant that defendant appeared at the police station voluntarily. Furthermore, more than a month had gone by after initially speaking to the investigating detective on the phone about the victims' allegations and then later sitting through an in-person interview. During that interim period, no arrest had taken place. We conclude that these circumstances cut heavily in favor of a finding that defendant was not in *Miranda* custody before the time when Lawrie told defendant he would not let him go home.

### b. Location of the Interview

Our high court recognized long ago that, even when an interview room is in a secure area of a police facility, that circumstance does not necessarily mandate a finding of custody. (*People v. Ochoa* (1998) 19 Cal.4th 353, 403 ["the fact that [the defendant] was questioned in the police station's polygraph examination room does not necessarily require a finding of custody, even if the room was in a secure area"].) Similarly, the court in *Potter* reasoned: "The fact that an interrogation occurred at the police station does not, by itself, render the interrogation custodial." (*Potter*, *supra*, 66 Cal.App.5th at p. 540.)

We conclude that this circumstance is insignificant here, especially since defendant appeared for the second time at the police station voluntarily and got there on his own. This circumstance does not cut in favor of a finding of *Miranda* custody.

### c. What Defendant Was Told About His Custody Status

Neither detective here said nor did anything that created a coercive atmosphere such that a reasonable person would have "experienced a restraint tantamount to an

arrest." (*Aguilera*, *supra*, 51 Cal.4th at p. 1162.) To the contrary, defendant was told multiple times that he was not under arrest and that he would be going home. This message was first communicated to defendant during Lawrie's May 2 interview: "you're free to leave"; "if you get mad or you're pissed off at me or you wanna stop the interview, just let me know. I'll escort you back out, we'll call a cab, take you back to work." And, as noted, he was allowed to leave after that first in-person interview. An objectively reasonable person would have this historical circumstance in mind when similar statements were made to him on June 12.

On June 12, Killip made such statements to defendant multiple times: the polygraph test was "100% voluntary"; "this is a voluntary test, you are not under arrest. When we're done, you're leaving"; "Get you done, so you can get out of here"; "I wasn't lying. When you're done here today, you're leaving"; "You're not going to jail. Aren't you going to work when you leave here?"; "you're leaving when you're done here today." Additionally, the polygraph advisement form expressly told defendant he was under no obligation to make any statements: "I acknowledge that I have been advised by the undersigned witness [Detective Killip] of my right to consult an attorney *now and throughout all further proceedings* in this case and of *my right to remain silent*." (See fn. 10, *ante*., italics added.) Our state's high court has found a similar polygraph advisement to be significant in the *Miranda* custody analysis, stating: "Most important, defendant signed a statement that told him that the interview was voluntary" and "[a] reasonable person in defendant's position, knowing that he or she need say nothing at all, would understand that he or she would do the examiner a favor by offering to leave rather than wasting the examiner's time by sitting mute." (*Ochoa*, *supra*, 19 Cal.4th at p. 402.) Indeed, the advisement here cuts more against a finding that the interview was custodial than in *Ochoa*. Not only did the form used here advise that taking the polygraph was

33

voluntary, but it also told the defendant he had right to counsel and the right to remain silent "now and throughout all further proceedings in this case."[21]

Up until the time Lawrie expressed discomfort in letting defendant leave because of his suicidal mental state, nothing the detectives did or said nullified what they had told him about being free to terminate the questioning and leave. Under the circumstances of this case, an objectively reasonable person would have understood he was not in custody or a restraint tantamount to arrest, especially when similar statements about being free to leave were made to him in the previous month and he was, at that time, allowed to leave. These circumstances significantly cut against a finding of *Miranda* custody.

### d. Awareness of Ability to Terminate the Interview

The court in *Aguilera*, indicated that whether the person's conduct indicated an awareness of the ability to terminate the interview is a factor to be considered. (*Aguilera, supra*, 51 Cal.App.4th at p. 1162.) This is not an objective circumstance and seems inconsistent with the high court's pronouncement that the determination of custody depends on the objective circumstances of the interrogation and not the subjective views of the person being questioned. (*Stansbury*, *supra*, 511 U.S. at p. 323.) Factoring in this circumstance " ' "place[s] upon the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question," ' " something the high court sought to avoid by declaring that the test is an objective one. (*Yarborough, supra,* 541 U.S. at p. 662.) It would seem that the appropriate consideration is whether a reasonable person

---

[21] The advisement in *Ochoa* was as follows: " 'I, Lester R. Ochoa, do hereby agree to submit myself to an instrumental detection of deception examination. The polygraph examiner in this case is D.R. Hooker. [¶] I am taking this examination freely and voluntarily, and without any promise of reward or immunity, and without any force (mental or physical), or threat of any force. [¶] I clearly understand that I am not required to make any statements relative to this case.' " (*Ochoa*, *supra*, 19 Cal.4th at p. 402.)

under the circumstances would have had an awareness of the ability to terminate the interview, not whether defendant actually did.

Defendant contends it is relevant that at certain times he expressed the belief or suspicion that he would be arrested and jailed: " 'I don't feel like – like trying to run out, then the detective just tackles me down' "; " 'Today's the last day that I will ever be free' "; " 'Yeah, I'm ready to go to jail.' " But to each statement, Killip corrected defendant. When defendant made the statement about the detective tackling him if he left, Killip told defendant, "No, no, no. That's not how it's gonna to be. . . Like I said, this is a voluntary test, *you are not under arrest. When we're done, you're leaving*." (Italics added.) After defendant made the statement about it being the last day he would be free, Killip told defendant, "Okay. Let me explain. *I wasn't lying. When you're done here today, you're leaving.*" (Italics added.) After defendant said he was ready to go to jail — a statement that, based on the circumstances and the way it was said, suggests to us that defendant was feeling contrite and remorseful — Killip told defendant, "*You're not going to jail*," and then asked, "*Aren't you going to work when you leave here*?" Defendant has not explained why a reasonable person under the circumstances would have considered their situation to be tantamount to arrest given Killip's statements and we see no reason why that would be the case.

Moreover, there were times when defendant made statements indicating he did not view his situation as being tantamount to arrest and that he believed he would be going home after talking with the detectives. In this regard, defendant's understanding mirrors that of a reasonable person under the circumstances.

After making admissions, defendant stated that "*when I go home*," one of his brothers "gonna go an ape shit" and his family would not trust him. (Italics added.) He stated, "So *if I leave*, I cannot go home and hang myself, huh?" (Italics added.) When Killip asked him about going to work after they were done at the police station, he responded by saying he had to tell his mom what he had done and "*[s]he's gonna make*

35

*me walk home*." (Italics added.) Before concluding with defendant, Killip expressly told defendant, "*But you're leaving when you're done here today*." (Italics added.) Defendant responded, "Until they get a warrant on me" — a statement that suggests defendant did not believe he was under arrest, but might be arrested sometime in the future. Later, when talking to his mother, defendant said to her, "*if I was to go home with you*, I would have done something to where [M.] and [D.] would have felt responsible for causing me to kill myself." (Italics added.) On this record, it appears defendant did not view his situation as tantamount to an arrest and he believed he would be going home after talking with the police, even though he had made admissions. We view this belief as being consistent with that of a reasonable person under the circumstances.

### e. Restrictions on Defendant's Movement

There were no apparent restrictions on defendant's movement during the interview, save for the time period he was hooked up to the polygraph. He was not handcuffed during the interviews with Killip or Lawrie. When he entered the interview room each time, the video recordings show defendant taking a seat under his own power.

This circumstance cuts against a finding of custody.

### f. Length of the Interviews

We find the length of the interviews here to be insignificant as to the question of *Miranda* custody. All total, the amount of time defendant spent with Killip was only approximately two hours. As we previously noted, most of the interview consisted of pretest questions. We need not go over that portion of the interview or the administration of the test, because defendant asserts the interview became custodial when he admitted complicity.

Defendant first admitted molestation conduct to Killip at 8:54 a.m. and first mentioned hurting himself at 8:57 a.m. He exited the room with Lawrie at 9:08 a.m. Questions by Killip during this 14 to15 minute period were open ended, the tone was conversational and sympathetic and consisted mostly of defendant talking. We conclude

36

that the time defendant spent with Killip does not cut in favor of a finding of *Miranda* custody.

Lawrie interviewed defendant for approximately 15 minutes and then went to look for defendant's mother. After defendant had written the apology letter while they were waiting for his mother to return to the police station, Lawrie came back in and read his letter aloud. Thereafter, he told defendant he had talked to his supervisor and did not feel comfortable letting defendant go home. As we have said, defendant was in custody for purposes of *Miranda* at this point. Thereafter, they spoke for six minutes before Lawrie left again. Lawrie returned with defendant's mother and during the next seven minutes, at defendant's earlier suggestion ("I think she should come and hear what I have to say in front of you"), he admitted molesting M. and D. to her and Lawrie explained to defendant's mother that defendant would be arrested. Lawrie left again. While Lawrie was gone, defendant and his mother spoke alone for a little more than 20 minutes. When Lawrie returned, he *Mirandized* defendant and interviewed him for 33 minutes.

The length of time here does not cut in favor of a finding of *Miranda* custody.

### g. Number of Officers Present

During each of the interviews, there was only one officer present. This was not a situation where multiple officers outnumbered defendant, enhancing the police-dominated environment. This circumstance does not cut in favor of a finding of *Miranda* custody.

### h. Nature of the Questioning[22]

"*Miranda* warnings are not required 'simply because . . . *the questioned person is one whom the police suspect*.' [Citation.] While the nature of the police questioning is

---

[22] Under this subheading, we consider, among other things, the factors related to whether police manifested a belief defendant was culpable and they had evidence to prove it and whether the police were aggressive, confrontational, and/or accusatory, whether the

37

relevant to the custody question, police expressions of suspicion, with no other evidence of a restraint on the person's freedom of movement, are not necessarily sufficient to convert voluntary presence at an interview into custody." (*Moore, supra*, 51 Cal.4th at p. 402.) In discussing this circumstance, the *Potter* court noted that the detectives there "clearly indicated to defendant that he was suspected of having molested his daughter, [and] defendant had two weeks to contemplate the decision to come to the police station to speak to police and undergo a polygraph examination. He voluntarily chose to do so." (*Potter, supra*, 66 Cal.App.5th at p. 541.) The same can be said here — the detectives told defendant about the allegations his nieces had made, and he had more than a month to contemplate his decision to voluntarily come to the police station for a polygraph after a detective first told him about those allegations. (*Ibid.*)

The *Potter* court observed that the original detective's interview "was not particularly intense or confrontational." (*Potter*, *supra*, 66 Cal.App.5th at p. 542.) The same can be said about both detectives here. As noted, the tone of both detectives here was casual and conversational, and, at times, sympathetic and consoling. In *Potter*, the panel agreed with the trial court's description of the defendant's interview by the polygrapher detective as "more like a 'therapy session' than a typical interrogation." (*Ibid.*) In many ways, the same can be said here. The detectives were obviously concerned about defendant's mental state and made numerous efforts to divert his thoughts away from committing suicide.

The detectives here did not dominate or control the conversation in a way that would cause a reasonable person to believe his situation was tantamount to arrest. Much of defendant's discussion was narrative. The non-dominating tone of the Lawrie interview is illustrated by several things defendant did during the interview. As noted,

police dominated the interview, as well as, arguably, whether the express purpose of the interview was to question the person as a witness or a suspect and whether police used interrogation techniques to pressure defendant.

defendant initially said he did not feel like writing an apology letter and Lawrie replied, "okay, no problem." On one occasion, defendant corrected Lawrie.[23] On another occasion defendant made a joke.[24] On another occasion, defendant stopped Lawrie from interrupting him.[25]

This case is unlike *Saldana, supra*, 19 Cal.App.5th 432, upon which defendant relies.[26] The *Saldana* court noted that, after the interrogating detective told the defendant

---

[23] At one point, Lawrie asked, "You said D. touched your penis with her hands, but not with her mouth, or did she touch it with her mouth too?" Defendant replied, "I never said that D. touched my penis." That was true; he had not said that. Lawrie said, "My mistake, that was just M." Defendant said, "Yes."

[24] At one point after defendant had confessed, defendant volunteered, "would you like me to call you Detective Lawrie?" Lawrie responded you can call me anything you like, "just don't call me late for dinner." Defendant replied, "I'm sorry. I'm not serving your favorite dish tonight." They both chuckled.

[25] During the post-*Miranda* interview, Lawrie asked defendant about S. After defendant denied that anything happened between the two, Lawrie made the only accusatory statement he made during the interview and told defendant he thought something did happen with S. based on what M. and D. had said. Defendant said, "Well we never really did anything, you know, like. . ." Lawrie interrupted and defendant interrupted Lawrie saying, "Hold on, I'm saying right now if you listen to me." Lawrie apologized for interrupting, telling defendant politely, "I'm sorry. I'm sorry." Thereafter, defendant went on to say he and S. never did anything "sexual," but he did touch her breasts and rubbed her vagina outside her clothes.

[26] Defendant asserts the *Saldana* court held that the defendant's question, "What's going to happen to me?" indicated he was not free to leave, citing *Saldana*, *supra*, 19 Cal.App.5th at page 441. But the *Saldana* court did not say that at the cited page or any other page in its opinion. Defendant further asserts, focusing on Lawrie mentioning the potential future event of the prosecutor's review and charging decision, that the court in *Saldana* "recognized that threats that a suspect might be arrested later undermine claims that a current interrogation is voluntary." But the *Saldana* court stated such statements did not make the setting custodial. The court wrote: "At the outset, [the detective] told Saldana, '[Y]ou're not under arrest,' and 'You can leave when you want.' Saldana acknowledged this and even said, 'I agree.' However, after telling Saldana he was free to leave, the detective said, "Um, we're not going to arrest you right now"—suggesting that

he was not under arrest and could leave when he wanted, the interrogation became "persistent, confrontational and accusatory." (*Id*. at p. 437.) The detective repeatedly told the defendant he did not believe his denials and that he was not telling the truth. (*Id*. at p. 462.) The court wrote: "[I]n light of the detective's repeated rejection of Saldana's denials, a reasonable person in Saldana's position eventually would have realized that telling the 'truth' meant admitting the detective's information was correct—and that until this 'truth' came out, the person could not leave." (*Id*. at p. 458.) The *Saldana* court reasoned that, compared to the circumstance that the defendant was interrogated by only one officer, the "more significant factor" was "the nature of the questioning, the character and quality of the interaction between law enforcement and the person being interrogated." (*Id*. at p. 463.) The court held: "[W]hen police create an atmosphere equivalent to that of formal arrest by questioning a suspect who is isolated behind closed doors in a police station interrogation room, by repeatedly confronting him with the evidence against him, repeatedly dismissing his denials, and telling him at the outset he is free to leave—when all the objective circumstances later are to the contrary—*Miranda* is triggered." (*Id*. at p. 438.)

That is not what happened here. While it was made clear to defendant from the first interview that his nieces had made accusations against him, the detectives did not "confront" him with this evidence in the way referenced in *Saldana*. Nor did they dismiss his denials or try to convince him they could prove the allegations against him. In our view, there was nothing about the tone or tenor of the questioning here that would have caused a reasonable person in defendant's position to have believed he was in a

---

Saldana might well be arrested later. [¶] Telling Saldana he was not under arrest and was free to leave indicates the beginning of the interrogation was not custodial. [¶] Even with the somewhat ominous—you will not be arrested 'right now'—a reasonable person would have felt free to walk right out the door." (*Saldana*, at p. 457.)

situation tantamount to arrest prior to Lawrie telling defendant he was not comfortable letting him leave because he seemed suicidal.

### i. Post-statement Arrest

Unlike the defendant in *Potter*, who was allowed to leave the police station after his interviews with the police, defendant here was arrested at the police station. Superficially, this circumstance would appear to cut in favor of a finding of *Miranda* custody. But close examination of the evidence reveals defendant would not have been arrested had he not repeatedly expressed suicidal ideations. Lawrie told defendant he did not feel comfortable letting defendant go for that reason. And Lawrie told defendant's mother in front of defendant that defendant's talk of suicide was the reason he was being arrested: "the reason he's gonna go to jail today is because [he] feels he's gonna kill himself . . . and he's told me that several times. He's told the other officer that and our concern is for [defendant] cause we don't want him to harm himself. . . . So in his safety right now, he's gonna go to jail."

Nothing in the evidence suggests the detectives would not have honored their earlier commitment to allow defendant to go home that day no matter what admissions he made — just as the detective did in *Potter* — had defendant not expressed the desire to take his own life. The evidence simply does not establish that the officers did or said anything that would cause a reasonable person, aware of all the circumstances, to feel he was in a situation tantamount to arrest up until being told he would be detained because of his expressed suicidal ideations.

Under the circumstances presented here, we conclude that this circumstance does not cut in favor of a finding of *Miranda* custody.

### 3. *Miranda* Custody Conclusion

As the court in *Aguilera* noted: "No one factor is dispositive." (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.) Rather, courts "look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere

such that a reasonable person would *have experienced a restraint tantamount to an arrest*." (*Ibid.*, italics added.) We have done that here and have considered the circumstances "as a whole." (*Pilster*, *supra*, 138 Cal.App.4th at p. 1403.) We conclude that, based on the totality of the circumstances, a reasonable person would not have experienced a restraint tantamount to arrest.

Accordingly, the trial court did not err in concluding defendant was not in *Miranda* custody up to the point Lawrie told defendant he did not feel comfortable letting him go because of his expressed thoughts of suicide. As we discuss *post*, the admission of statements defendant made after that, but before he was *Mirandized*, was harmless beyond a reasonable doubt.

### H. The Post-*Miranda* Statements

Defendant's sole *Miranda* argument on appeal is that he was in *Miranda* custody after he admitted complicity during his interview with Killip. He does not challenge the admissibility of the post-*Miranda* statements based on *Seibert, supra*, 542 U.S. 600, as the product of a deliberate two-step interrogation technique, as he did in the trial court. Defendant has abandoned this argument on appeal. Consequently, any such argument is forfeited. (*People v. Rundle* (2008) 43 Cal.4th 76, 121 (*Rundle*), disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 412, fn. 22 [a defendant who does not raise issues on appeal raised in the trial court waives them]; *Jones v. Jacobson* (2011) 195 Cal.App.4th 1, 19, fn. 12 ["issues and arguments not addressed in the briefs on appeal are deemed forfeited"].)

It is defendant's responsibility to establish error on appeal. (*Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 766 ["It is the appellant's burden to demonstrate the existence of reversible error"].) He has offered no compelling reason why the statements he made to Lawrie after he was *Mirandized* should not have been admitted. Consequently, we conclude the trial court did not err in admitting the statements defendant made after he was *Mirandized* and indicated he understood each of the

42

*Miranda* rights.  (See *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384-385, 388 [176 L.Ed.2d 1098] [where the prosecution shows a *Miranda* warning was given and understood by the accused, an accused's uncoerced statement establishes an implied waiver].)

As we discuss below, even if it was error to admit defendant's statements made during the post-*Miranda* portion of Lawrie's interview, any error was harmless.

### *I.*  Harmless Error

We assess whether allowing evidence of statements taken in violation of *Miranda* is harmless by applying the harmless beyond a reasonable doubt standard.  (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705]; *People v. Davis* (2010) 46 Cal.4th 574, 598 [*Chapman* standard applies to *Miranda* error].)

As we recently observed, "Under *Chapman*, '[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and *considering all relevant circumstances*, it determines the error was harmless beyond a reasonable doubt.'  [Citation.]  Under *Chapman*, the People must show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]  ' "To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." '  [Citation.]  In other words, the *Chapman* harmless error inquiry asks: ' "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" '  [Citations.]  Since *Chapman*, our high court has ' "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." ' "  (*People v. Powell* (2021) 63 Cal.App.5th 689, 715 (*Powell*).)

The statements defendant made between the point when Lawrie told defendant he did not feel comfortable letting defendant go home and when defendant was *Mirandized*

43

added little to the statements defendant made during the noncustodial portion of the interview. As for the statements defendant made post-*Miranda*, they were essentially a recapitulation of what he said during the non-custodial part of the interview, although additional detail, e.g., the number of molestations, was provided. Given the other evidence the jury heard, we conclude that the error in introducing the custodial statements and any error regarding the statements made post-*Miranda* was harmless beyond a reasonable doubt.

The other evidence included the unchallenged admissions defendant made to his mother that he touched and licked the victims' vaginas. This evidence was devastating. Defendant completely ignores these admissions in his argument for prejudice.

Moreover, on appeal, defendant does not identify any problems with the victims' testimony or problems with the other evidence that corroborated their accounts of defendant's molestations. In his opening brief, defendant only attempts to minimize the significance of this testimony by asserting that it was "merely the 'some evidence' to corroborate [defendant's] out-of-court statements required by the corpus delicti rule." In his reply brief he simply argues his confession was "the cake" and the testimony of the victims was "the icing," and "the icing" would not have been sufficient to support a conviction. We disagree. We view the testimony of the victims as being equally devastating to the statements defendant made to his mother. And defendant completely ignores evidence from the victims' grandmother that helped corroborate the victims' testimony about the molestations. Given the combination of this evidence, the error in admitting the *un-Mirandized* custodial statements and any error related to the post-*Miranda* statements is harmless beyond a reasonable doubt.

M. testified about multiple molestations defendant perpetrated upon her beginning when she was in the third grade. The sexual acts included regular acts of oral copulation by defendant upon her and at least one act of touching her vagina with his hand. The acts occurred in defendant's bedroom, including inside defendant's walk-in closet. She

44

testified she noticed pictures of adult blond females on his computer in skimpy clothing and further testified that defendant told her those women reminded him of her. He told her he would cut his stomach if she refused his advances. And he told her "they'll keep us three football fields away from each other" if she told anyone about the molestations. She kept the molestations a secret because she feared she would be removed from the house and leave her stepbrother and stepsister, D., "vulnerable."

D. testified that defendant touched her vagina multiple times, with his hand, tongue, mouth, and penis. He licked her private part. He touched her while she was watching her favorite movie, Daddy Daycare. He rubbed his penis on her private area. All of the incidents happened in defendant's room on his bed. At the forensic interview, she also stated that defendant put his "straight" "pee-pee" in front of her face while she was watching Daddy Daycare.

The victims' maternal grandmother testified defendant's job was to take care of the children. She went on to testify about incidents involving defendant. On one occasion, when she picked up the children for the weekend, defendant stood by the front of the car where M. was seated. He was staring into the car and his arms were folded. M. did not look at defendant. She looked straight ahead like she had "tunnel vision." The grandmother later asked M. whether defendant was mad at her, and M. only replied, "it's okay." When it came time to take the children home at the end of the weekend, M. cried and begged the grandmother not to take her back. The grandmother prodded M. for a reason, but M. would not say anything.

The grandmother also testified that, around Christmas in 2010, defendant visited her home, where M. was then living. She saw defendant and M. in the girls' bedroom, facing each other. M. was on the bed and defendant was sitting in a chair. His hands were on M.'s upper leg, between her knee and thigh. M's foot was on defendant's knees. He was moving both his hands on M.'s thigh. The grandmother got a "sick gut feeling." She told M. to come help her with something in the garage. She asked M. if "Uncle Tony

45

ever hurt [her]." M. was "immediately flushed red" and she had an expression on her face like "a deer in headlights. Like I just got found out." She disclosed that defendant had been touching her inappropriately, but she did not give details.

On cross-examination, the grandmother was asked if she ever asked the other children whether anything had happened to them. One of the boys told her Uncle Tony did not like boys, he only liked little girls. He also told her that defendant watched pornography in his bedroom.

On the day after Thanksgiving in 2011, D. told her grandmother defendant rubbed his private parts on hers. D. also told her that on one occasion D. opened defendant's bedroom door and saw defendant "hurting M. like he hurts [her.]"

Defendant argues that the prosecutor relied on his statements to Lawrie during closing argument. Courts look to the prosecutor's argument as a relevant circumstance in determining whether an error is harmless. (*Powell*, *supra*, 63 Cal.App.5th at p. 715 [instructional error].) But here, as we have held, portions of defendant's statements were admissible. The prosecutor's arguments by and large did not include much that was substantively different from what defendant said before Lawrie told defendant he was not comfortable letting defendant go. As for the things defendant said post-*Miranda* not included in the non-custodial statements defendant made earlier, such as his specific estimation of the number of times he molested the victims and his reference to his perverted thoughts, those statements were inconsequential given the other evidence, so any error in admitting these statements was also harmless.

Having examined the entire cause, including the totality of the evidence, and having considered all relevant circumstances, we conclude that a rational jury would have found defendant guilty absent the custodial, *non-Mirandized* portion of the Lawrie interview we have concluded was inadmissible. (See *Powell, supra*, 63 Cal.App.5th at p. 718.) We conclude the same concerning the post-*Miranda* statements, assuming their admission was erroneous. Any error here was " 'unimportant in relation to everything

46

else the jury considered on the issue' " of defendant's guilt. (See *ibid*.) Consequently, the error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24; *Powell*, at p. 718.)

## J. Voluntariness Claim

On appeal, defendant argues for the first time that his confession was involuntary apart from *Miranda*. He argues that Killip employed deceptive tactics during the polygraph that rendered defendant's statement involuntary.

A defendant ordinarily forfeits a voluntariness claim that was not raised below. (*People v. Williams* (2010) 49 Cal.4th 405, 435; *People v. Ray* (1996) 13 Cal.4th 313, 338-339.) Similarly, a defendant's failure to object on the grounds that statements were coerced forfeits such a claim on appeal. (*People v. Kennedy* (2005) 36 Cal.4th 595, 611-612, overruled on other grounds in *Williams*, at pp. 458-459.) When defendant failed to raise these issues, "the parties had no incentive to fully litigate this theory ... and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings." (*Ray*, at p. 339; see also *People v. Quiroz* (2013) 215 Cal.App.4th 65, 78 ["Because the question of coercion turns on the intensely factual inquiry into the totality of the circumstances [citation], it is an especially poor candidate for first-time consideration on appeal"].)[27]

---

[27] Here, there was evidence not admitted at the *Miranda* hearing related to the communications before the May 2 interview and the communications between that interview and the June 12 interviews. For example, during the June 12 interview, Lawrie said to defendant, "you've been askin' me to take a . . . polygraph exam," a statement defendant did not refute. There was no evidence introduced indicating when defendant had been asking to take the polygraph, specifically what he said and what was said to him, how many occasions this occurred or the circumstances under which defendant's requests had been made. This is the kind of evidence one would expect to have been introduced if defendant made a voluntariness challenge based on coercion, because if defendant was desirous of taking the polygraph before he met with Killip, that evidence undermines any notion that what Killip said to him was coercive. There was also

47

All of defendant's argument headings in his written motion cited *Miranda*, and all of the arguments under those headings addressed only *Miranda*.[28]  None of his arguments in the text of the motion asserted that any of the statements were involuntary or advanced a due process argument for suppressing them, let alone any specific theory of involuntariness.  Nor did defendant claim that his statements were involuntary in oral argument during the hearing on the *Miranda* motion.  (See *Rundle, supra,* 43 Cal.4th at pp. 122–123 [defendant's claim on appeal that his statements were involuntary because of the " 'extensiveness of the interrogations' " was forfeited because it was not made in the trial court]; *People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 (*Polk*) ["unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision"].)

_____

potential evidence concerning conversations that may have taken place between law enforcement and defendant at the police station just prior to Killip's interview and conversations that may have taken place between Killips' interview and Lawrie's.  It was also unclear how defendant arrived at the police station on June 12, other than he got there on his own, and how long his mother was there.  And it is possible the prosecution would have introduced testimony to address defendant's coercive police tactics theory of involuntariness raised the for the first time here on appeal.

[28] The substantive argument headings in defendant's written *Miranda* motion are as follows:  "I.  UPON MOTION BY THE DEFENSE, THE BURDEN IS ON THE PROSECUTION TO PROVE THAT A STATEMENT IS ADMISSIBLE UNDER *MIRANDA*"; "II. THE DEFENDANT'S STATEMENT TAKEN PRIOR TO HIS FORMAL ARREST WAS IN VIOLATION OF *MIRANDA V. ARIZONA* BECAUSE THE DEFENDANT WAS SUBJECTED TO CUSTODIAL INTERROGATION AND NO FIFTH AMENDMENT WARNINGS WERE GIVEN OR WAIVER TAKEN"; "III. THE DEFENDANT WAS IN CUSTODY FOR PURPOSES OF *MIRANDA* PRIOR TO HIS FORMAL ARREST"; and "IV.  THE DEFENDANT'S STATEMENT TAKEN AFTER HIS FORMAL ARREST WAS OBTAINED IN VIOLATION OF *MIRANDA V. ARIZONA* BECAUSE THE DELAYED POST-CONFESSION WARNING WAS INEFFECTIVE."

Defendant argues against forfeiture in his reply brief, but ignores the above authorities. Instead, he relies on *People v. Avena* (1996) 13 Cal.4th 394, which is inapposite. *Avena* involved a claim of ineffective assistance of counsel grounded on the assertion that counsel did not object to the admissibility of a confession on voluntariness grounds. (*Id.* at pp. 419-420.) Our high court concluded that trial counsel *had* made such an objection. The defendant testified at an Evidence Code section 402 hearing on the admissibility of the statement that he had been beaten by the police. (*Ibid.*) In rejecting the defendant's claim that the objection had not been made, our high court noted: "When making his motion to suppress, counsel noted there were 'several reasons' why the court should decide to suppress defendant's statements, including failing to read the *Miranda* rights, failure to respect defendant's alleged request for an attorney, and *'[o]f course, there is the beating aspect.'* " (*Id.* at p. 420.) Our high court concluded that: "[a]lthough an inartful articulation of the claim that the statements were involuntary as the alleged product of a physical assault, counsel's reference to the ' "beating aspect" ' fairly raised the issue." (*Ibid.*) Even if *Avena* had application in the context of forfeiture (the more recent authorities cited *ante* suggest it does not), defendant points to nothing in his written motion or his oral argument on the motion that fairly raised any claim of involuntariness, and we have found nothing that did so.

Defendant points to the trial court's written ruling in which it stated: " 'Defendant's statements were uncoerced, voluntary, and not the product of a custodial interrogation.' " Defendant suggests that the trial court understood he was making an argument that his statements were coerced and involuntary and ruled accordingly. However, the fact remains that defendant never made a coercion-involuntariness argument in writing or orally on-the-record; nor did the trial court's finding suggest that he did. Moreover, the prosecution was thus never tasked with the responsibility of meeting this fact-specific due process claim, including the purported coercive interrogation tactics defendant belatedly complains about on appeal; nor was the trial

49

court asked to issue a ruling on due process grounds about these tactics. Allowing an argument on appeal not advanced in the trial court is unfair not only to the trial judge, but also to the adverse party. (*Polk*, *supra*, 190 Cal.App.4th at p. 1194, quoting *People v. Saunders* (1993) 5 Cal.4th 580, 589-590 [one explanation for the forfeiture rule "is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial"].)

Here, the trial court made its ruling based on the recorded interviews and transcripts. Other evidence that might have been admitted to establish voluntariness, including evidence specific to the claim of coercive tactics, was not introduced because the theory defendant raises on appeal was not raised in the trial court. (See fn. 27, *ante*.) As noted, to preserve a confession suppression theory for appeal, a defendant must assert that specific theory in the trial court. (See *Rundle, supra,* 43 Cal.4th at pp. 122–123; *Polk*, *supra*, 190 Cal.App.4th at p. 1194.)

Because defendant's motion in the trial court was grounded only on *Miranda*, he has forfeited his involuntariness claim as a separate basis for suppressing his statements.

\* \* \* \* \*

50

**DISPOSITION**

The judgment is affirmed.

　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　MURRAY, J.*

We concur:

　　/s/
RAYE, P. J.

　　/s/
DUARTE, J.

---

*  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.